**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**UNITED STATES OF AMERICA**

v.                                                                  Case No. 8:24-cr-21-WFJ-CPT

**ALEXANDER LIGHTNER**
_____/

<u>**MOTION TO DISMISS COUNT TWO:**</u>
<u>**CHALLENGE TO THE CONSTITUTIONALITY OF 26 U.S.C. § 5861(d)**</u>

**NOW COMES** Defendant, Alexander Lightner, by and through undersigned counsel, and moves this Court to dismiss Count Two of the indictment because the statute on which it is based is unconstitutional, facially and as applied.

<u>**MEMORANDUM OF LAW**</u>

<u>**BACKGROUND**</u>

Count Two of the indictment alleges that Mr. Lightner possessed an unregistered firearm silencer in violation of the National Firearms Act, 26 U.S.C. § 5861. A firearm silencer – more accurately called a suppressor or moderator – is either a permanent part of the weapon's barrel or an attachment that muffles the firearm's noise when fired. It reduces noise, although it cannot "silence" any firearm. Silencers' primary purpose is hearing protection through the reduction of noise at its source, eliminating or reducing reliance on ear protection. They also aid in accuracy by reducing recoil, the firer's natural instinct to flinch in anticipation of the noise, and the firer's disorientation after the first shot (from the recoil, noise, and muzzle flash). Silencers increase a firearm's size and weight, and so reduce its

concealability. As such, silencers have important applications to self-defense, sport shooting, and hunting, and little application to violent crime, notwithstanding Hollywood representations to the contrary.

The Government will seek to prove Count Two with evidence that, during a search warrant of Mr. Lightner's home, they found a homemade silencer in a laundry hamper in Mr. Lightner's bedroom. The silencer had no markings on it and was not registered with the government. Mr. Lightner told FBI agents that he made the item when he was 12 years old.

## ARGUMENT

This Court should dismiss Count Two for two reasons. First, Mr. Lightner has a right under the Second Amendment to possess a silencer, and the NFA's regulation and criminalization scheme is no part of the American tradition of arms regulation. Second, Congress lacks any enumerated power to criminalize Mr. Lightner's possession of a silencer, including under the Taxation Clause, because the NFA functions as a penalty, not a tax.

The statute underlying Count Two provides, "It shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record[.]" 26 U.S.C. § 5861(d). By statutory definition, a silencer is a "firearm" under the NFA. *Id*. § 5845(a)(7). Under the NFA, the government maintains a "central registry" of NFA-defined firearms, called the National Firearms Registration and Transfer Record (NFRT). *Id*.

§ 5841(a). A manufacturer, importer, or maker of an NFA-defined firearm must register the firearm in the NFRT, and each firearm transferred must be registered to the transferee by the transferor. *Id*. § 5841(b). To make or transfer a firearm, the maker or transferor must first obtain authorization from the government, which authorization effects a registration of the firearm in the NFRT. *Id*. § 5841(c). In conjunction with the making of an NFA-defined firearm, the maker must pay a $200 tax. *Id*. § 5821.

## I. The NFA violates the Second Amendment facially and as applied.

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), after describing a two-step approach many lower courts had adopted for Second Amendment challenges in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court stated:

> Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 17 (quoting *Konigsburg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Elaborating on this new test, the Court explained that it will apply straightforwardly to many gun regulations, such as where "a general societal problem" has persisted since the Second Amendment's ratification, and historical evidence supports or contradicts a historical tradition of regulation in the manner at issue. *See id*. at 26-27. In these cases, courts should consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id*. at 27 (quoting *Heller*, 554 U.S. at 631). However, the Court also explained that "a more nuanced approach" is required in cases "implicating unprecedented societal concerns or dramatic technological changes . . . ." *Id*.

Just as the Constitution protects forms of speech or shields against forms of surveillance unknown at the founding, the Second Amendment protects the use of modern "arms." *See id*. (citing *Heller*, 554 U.S. at 582). "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers *modern instruments that facilitate armed self-defense*." *Id*. at 28 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per curiam)) (emphasis added). The Court added that historical reasoning by analogy may be permissible in determining the constitutionality of a modern firearm regulation, which involves determining whether a proposed historical precedent is

4

"relevantly similar." *Id*. at 28-29 (citation omitted).

The Court reiterated *Heller*'s determination "that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id*. at 47 (citing *Heller*, 554 U.S. at 627). Applying this new framework to the New York handgun-licensing law at issue, the Court explained that "handguns are weapons 'in common use' today for self-defense." *Id*. at 32 (citing *Heller*, 554 U.S. at 580; *Caetano*, 577 U.S. at 411-12). Next, the Court determined that the Second Amendment's plain text covers the conduct at issue, the public carry of arms. *Id*. Shifting the burden to the government, the Court conducted an exhaustive historical review to determine that no historical tradition supported New York's regulation. *Id*. at 38-70.

Under *Bruen*, the burden shifts to the Government in this case to show a historical tradition of regulating silencers. Silencers are "modern instruments that facilitate armed self-defense." *Id*. at 28 (citation omitted). They "facilitate armed self-defense" because they eliminate the need for ear protection by decreasing sound at the source, they prevent injury, and they enhance accuracy by reducing recoil, the firer's natural inclination to flinch in anticipation of the shot, and the firer's disorientation after the first shot. Exhibit 1 (Knox declaration). And, silencers are "in common use for self-defense today": there are 2,664,774 registered silencers in the United States, Exhibit 2 at 16 (ATF Annual Statistical Update 2021); 42 states

make silencer possession lawful[1]; demand for silencers is increasing, and greater numerical possession is suppressed by the NFA provisions at issue here; and silencers are very rarely used to commit crimes, Exhibit 3 (ATF White Paper); Paul A. Clark, *Criminal Use of Firearm Silencers*, WESTERN CRIMINOLOGY REVIEW 8(2) 52 (2007) ("In more than 92 percent of cases the silencer involved in the prosecution was not actively used in any way, but was simply found in the possession of the defendant."); *cf. Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment) (finding stun guns to be protected by the Second Amendment because "hundreds of thousands" "have been sold to private citizens" and 45 states permit their possession).

Pre-*Bruen* cases holding that the possession of silencers for lawful purposes is not Second Amendment protected activity have been abrogated by *Bruen*. *See, e.g., United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Such cases typically reasoned that "[a] silencer is a firearm accessory; it's not a weapon in itself . . . ." *See id*. But under *Bruen*, the Second Amendment presumptively protects the possession of any "instrument" that "facilitates" "*armed* self-defense." *See* 142 S. Ct. at 2142 (citation omitted) (emphasis added). That is precisely what a silencer is: it facilitates

---

[1] Only eight states and the District of Columbia regulate or ban silencers. S*ee* Cal. Penal Code § 33410; Del. Code. Ann. Title 11, § 1444; D.C. Code § 22-4514; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1(a)(6); Mass. Gen. Law. ch. 269, § 10A; N.J. Stat. Ann. § 2C:39-3(c); N.Y. Penal Law §§ 265.02, 265.10; 11 R.I. Gen. Laws Ann. § 11-47-20.

the self-defense of one who is armed.  Whatever the merits of cases like *Cox* when they were decided, they have been abrogated by *Bruen*.

Instead, as Judge Willett has shown in a similar case, firearm accessories that enhance accuracy and safety merit full Second Amendment protection under *Bruen*. *See Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) (*Mock I*).  In *Mock I*, the plaintiffs challenged an ATF rule that classified many pistols as "short-barreled rifles" under the NFA if owners added a pistol brace to the rear of the weapon, meant to stabilize the pistol.  *Id*. at 566-67.  Considering a Second Amendment challenge, Judge Willett explained:

> Rearward attachments, besides making a pistol less concealable, improve a pistol's stability, and thus a user's accuracy.  Accuracy, in turn, promotes safety.  Even for attachments that convert a pistol into a rifle under the statutes, ATF has not identified any historical tradition of requiring ordinary citizens to endure a lengthy, costly, and discretionary approval process just to use accessories that make an otherwise lawful weapon *safer*.  Instead, the NFA tends to regulate weapons that inflict indiscriminate destruction: "machinegun[s]", short-barreled "shotgun[s]", and "smooth bore" weapons (and for that matter, "explosive[s]", "grenade[s]", and "poison gas").  Weapons that begin as rifles, too, are more difficult to keep accurate once the barrel starts shrinking.
>
> In my view, protected Second Amendment "conduct" likely includes making common, safety-improving modifications to otherwise lawfully bearable arms . . . .  Adding a rearward attachment – whether as a brace or a stock – makes the pistol more stable and the user more accurate.  I believe these distinctions likely have constitutional significance under *Bruen*.

7

*Id*. at 588 (Willett, J., concurring).  The Fifth Circuit majority in *Mock* declined to touch on the Second Amendment issue, instead resolving the case on other grounds. *Id*. at 567.  On remand from the Fifth Circuit, the district court largely adopted Judge Willet's reasoning and ruled that pistol braces are protected under *Bruen*. *Mock v. Garland*, __ F. Supp. 3d __, 2023 WL 6457920, at *10-11 (N.D. Tex. 2023) (*Mock II*).

 Almost all of what Judge Willett has said about pistol braces can be said about silencers.  Silencers increase accuracy, and so in turn increase safety.  On top of this, silencers protect the shooter's hearing, mitigating the need to reach for ear protection as the burglars come through the door.  Silencers are well adapted to self-defense, and so are protected by the plain text of the Second Amendment – they are "modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28 (citation omitted).

 Mr. Lightner's alleged possession of an unregistered silencer is therefore presumptively protected by the Second Amendment.  And the Government cannot meet its burden of showing that regulation of silencers is part of a historical American tradition of firearm regulation.  No evidence from the Founding indicates a historical tradition of subjecting safety-enhancing firearm accessories to "a lengthy, costly, and discretionary approval process."  *See Mock I*, 75 F.4th at 588 (Willett, J., concurring).  To the contrary, founding-era historical evidence indicates that militiamen were *obligated* to possess certain firearm "accessories," like match and a musket rest.  *See United States v. Miller*, 307 U.S. 174, 179 (1939) (citation omitted).

Further, this country's history of personal gunsmithing rebuts any claim to a tradition of regulating firearm accessories like silencers:

> The history interwoven with the "the right of the people to keep and bear Arms" indicates that the Second Amendment's text has long incorporated the right of personal gunsmithing, *i.e.*, the right of private individuals to modify or acquire modifications to lawfully bearable firearms so as to increase their accuracy and safety for a more effective exercise of self-defense. For example, in order "[t]o sustain themselves against a large and well-supplied British military throughout the [Revolutionary] war, the Americans relied on gunsmiths, individuals with knowhow from working on their *own arms*, and Americans who were willing to *learn the art of arms manufacturing*." Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 51 (2022) (emphasis added). Analogous to the role that stabilizing braces play for contemporary pistol owners, Founding Era gunsmithing involved modifying lawfully bearable pistols with extended grips and rearward stocks to facilitate greater stability, control, and accuracy in single-handed self-defense fire.

*Mock II*, 2023 WL 6457920, at *11 (citation and footnote omitted).

The silencer is an invention of the early 20th century, and it was predominantly used then by law-abiding citizens. Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 41-46 (2015). In the NFA, Congress enacted what amounted to a 4,000% tax on silencers during the heart of the Great Depression, without findings suggesting any legitimate purpose for the law. *See id*. at 50. Compliance with the NFA's tax-and-registration regime imposes wait times of about eight months for "applications that are filled out correctly and completely." Exhibit 4 (Current Processing Times as

9

of Feb. 1, 2024); *cf. Bruen*, 142 S. Ct. at 2138 n.9 ("[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."). Federal law separately prohibits the possession of silencers by felons and other untrustworthy people, and harshly punishes criminal misuse of silencers, so that the burden of the NFA falls primarily on the law-abiding citizens. *See* Halbrook, supra, at 74. The Government cannot marshal historical evidence sufficient to show an American tradition of regulating the silencer that overcomes the presumption of Second Amendment protection under *Bruen*. The NFA's silencer provisions are therefore unconstitutional facially and as applied, and this Court should accordingly dismiss Count Two.

## II. Congress lacks the power to enact the NFA.

"Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000). The NFA provisions at issue here exceed any power enumerated for Congress, including Congress's power to "lay and collect Taxes." *See* U.S. Const. art. I, § 8, cl.1. *But see United States v. Bolatete*, 977 F.3d 1022, 1033-34 (11th Cir. 2020) (holding that the NFA's silencer provisions are not unconstitutional under the Taxation Clause).

Congress may use its tax power to influence conduct, but this power "is not

without limits." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 567, 572 (2012) ("*NFIB*"). Consistent with the United States' federalist system of government, the Supreme Court has cautioned that Congress's enumerated powers "must be read carefully to avoid creating a general federal authority akin to the police power." *Id.* at 536. As to its tax power, Congress's authority "is limited to requiring an individual to pay money into the Federal Treasury, no more." *Id.* at 574.

Not every exaction that Congress has labeled a "tax" constitutes a tax within Congress's power. As the Supreme Court has recognized, "there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment." *Id.* at 573 (citations and internal quotations omitted). While Congress may enforce its taxation laws, "criminal prosecution" is one of the "means most suggestive of a punitive sanction." *Id*. at 566, 574 n.11. To determine whether an exaction is a tax or a penalty, the Supreme Court applies a "functional approach," focusing on the "practical characteristics of the so-called tax." *Id.* at 565. In *NFIB*, for example, the Supreme Court was guided by three factors — whether the "tax" is (1) burdensome; (2) requires scienter; and (3) is enforced by an agency responsible for punishing violations of the subject laws. *Id.* at 565-66 (discussing *Child Labor Tax Case (Bailey v. Drexel Furniture)*, 259 U.S. 20, 36-37 (1922)).

Applying the *NFIB* framework here, the NFA provisions at issue function as a penalty, not a tax. First, the NFA "tax" was set to impose a heavy burden, and

11

exacts criminal punishment on those not responsible for paying it. In *Drexel Furniture*, the Supreme Court found that the "exceedingly heavy burden" of the "tax" — 10% of net income for any company that employed children — weighed against finding it to be a tax. *NFIB*, 567 U.S. at 565 (citing *Drexel Furniture*, 259 U.S. at 36-37). In the NFA, Congress set a $200 "tax," selecting that amount to match (and thus double) the price of a machine gun in 1934. *See* Halbrook, supra, at 50 (explaining that the tax rate on a machine gun was 100%). The tax rate on a silencer, which sold in 1934 for about $5, was roughly 4,000%. *See id.*

The person responsible for paying the tax is the person transferring the firearm, not the recipient. 26 U.S.C. § 5811(b) ("**By whom paid**.--The tax imposed by subsection (a) of this section shall be paid by the transferor."). And, the person responsible for registering the firearm before transferring it is the transferor, not the recipient. 26 U.S.C. § 5841(b) ("**By whom registered**.--Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes. Each firearm transferred shall be registered to the transferee by the transferor."). Yet, the NFA subjects the *recipient*, who is not responsible for paying these taxes, to severe criminal penalties of up to 10 years in prison and $10,000 in fines. 26 U.S.C. § 5871; *see Staples v. United States*, 511 U.S. 600, 616 (1994) (recognizing 10-year penalty as "harsh").[2] Indeed, Mr. Lightner is being prosecuted for possessing an unregistered

---

[2] This NFA criminal penalty is far more severe than other criminal penalties for failing to pay taxes. For example, the maximum penalty for violations of the Internal

12

silencer, not for failing to pay any tax. *Cf. Sonzinksky v. United States*, 300 U.S. 506, 514 (1937) (upholding NFA's $200 annual license tax on firearms dealers, in a case where defendant was prosecuted for "dealing in firearms without payment of the tax," without reaching whether the tax on transfers was valid). The driving force behind the NFA is thus a punitive criminal regulation of the possession of firearms, not the collection of the $200 tax on transferring or making firearms. *See* Exhibit 5 (ATF NFA description). This first consideration therefore weighs in favor of concluding that the NFA exceeds Congress's tax power.

Second, the NFA requires a showing of scienter. While the NFA does not expressly include a scienter requirement, the Supreme Court has held that, at a minimum, the Government must prove that the defendant knew the characteristics of the item that make it an NFA "firearm." *Staples*, 511 U.S. at 605, 618-19. This second consideration also favors treating the NFA as an unconstitutional penalty.

Lastly, ATF, a Department of Justice agency, administers and enforces the NFA. *See Bolatete*, 977 F.3d at 1033 n.9. The NFA is therefore not a tax collected by the Treasury Department, but is instead enforced by an agency responsible for punishing violations of gun laws. *Compare NFIB*, 567 U.S. at 563-54, 566 (upholding what Congress labeled a "penalty," in part because it was "collected solely by the IRS through the normal means of taxation" and the IRS "is *not* allowed to use those

---

Revenue Code is five years imprisonment (26 U.S.C. § 7201), with other violations carrying three-year (26 U.S.C. § 7206) or one-year (26 U.S.C. § 7203) terms.

means most suggestive of a punitive sanction, such as criminal prosecution"), *with Drexel Furniture*, 259 U.S. at 36-37 (striking down a "tax" on the use of child labor, in part because the tax was collected by an agency, the Department of Labor, responsible for punishing violations of labor laws, not collecting revenue). This factor therefore also weighs in favor of concluding that the NFA exceeds Congress's tax power. Accordingly, this Court should dismiss Count Two as based on an unconstitutional statute.

**WHEREFORE** the Defendant, Mr. Lightner, prays this Court will dismiss Count Two of the indictment.

DATED this 13th day of March 2024.

    Respectfully submitted,

    A. FITZGERALD HALL, ESQ.
    FEDERAL DEFENDER

    */s* **Samuel E. Landes**
    Samuel E. Landes, Esq.
    D.C. Bar No. 1552625
    Assistant Federal Defender
    400 North Tampa Street
    Suite 2700
    Tampa, Florida 33602
    Telephone: (813) 228-2715
    Facsimile: (813) 228-2562
    Email: Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th of March 2024, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Lindsey Schmidt.

/s *Samuel E. Landes*
Samuel E. Landes, Esq.
Assistant Federal Defender