UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

ALEXANDER LIGHTNER

CASE NO.   8:24-cr-21-WFJ-CPT

**UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION TO SEVER COUNTS**

The defendant, Alexander Lightner, threatened to commit a mass shooting in furtherance of his white supremacist ideology. A search of Lightner's home revealed that he had the ability, means, and intent to carry out his threat, to include firearms, ammunition, an illegal silencer, a bulletproof vest, and a mass-shooting instructional manual that described how these items could be used to inflict maximum casualties. For his actions, Lightner is charged with transmitting a threat to injure, in violation of 18 U.S.C. § 875(c), and possession of an unregistered silencer, in violation of 26 U.S.C. § 5861(d).

Now, Lightner moves to sever the two counts of his Indictment, and demands a separate jury trial for each count. Doc. 35. As explained in more detail below, Lightner's threat and his possession of the silencer and other weaponry he intended to use to carry out his threat are properly joined in the Indictment. Moreover, severance is not required because any potential prejudice to the defendant can be cured by a limiting instruction. Thus, the Court should deny Lightner's motion.

## MEMORANDUM OF LAW

I.    **Factual Background**

The evidence at trial will show that Lightner is a longstanding member of an Internet chat dedicated to racially or ethnically motivated violent extremist ("RMVE") ideologies.[1] Individuals in this particular RMVE community engage in online messaging platforms to disseminate rhetoric that is violent in nature and is intended to persuade others in the community to commit violent acts (including mass shootings, bombings, and hate crimes). To do so, members of the group use words and phrases that, in the community, illustrate their desire to commit violent acts. For example, the evidence at trial will show this group used terms such as "high score" to reference the death toll amassed by an attacker who commits an act of mass violence, and "saint" to refer to an individual who commits an act of violence in furtherance of the white supremacist and accelerationist goals. *See* Doc. 1 ¶¶ 6-7. Within this community, "saints" are often idolized for their "high scores" and praised for committing acts of mass violence to further the goals of the ideology.

And Lightner was seeking the same praise, validation, and approval that the "saints" before him had amassed for their own "high scores" and acts of terror. So, on December 29, 2023, Lightner made a series of statements in an online messaging platform made up of like-minded individuals (namely, neo-Nazis, white-supremacists, and RMVEs). *Id.* ¶ 5. These posts, when taken together and placed

---

[1] *See* https://www.dni.gov/files/NCTC/documents/news_documents/2022_10_FBI-DHS_Strategic_Intelligence_Assessment_and_Data_on_Domestic_Terrorism.pdf (last accessed on January 22, 2024).

2

into context of Lightner's ties to this RMVE community, conveyed the message that Lightner intended to carry out a mass casualty event (*i.e.*, a mass shooting).

Specifically, Lightner posted the following:

- "2024 there shall be saints u fuq"
- "Highscore shall be defeated"
- "I'll delete this, but I say to you there is no surrender only death. Only purpose"
- "When my @ says last seen a week ago remove me from everything."
- "It's so over. It's so begun."
- "It's called a .308 black tip."
- "I've spectator (sic) 15+ years, as a pushy, reluctant teacher better, role, fulfilled? Fuck all yall. I am greater. I tried life as the system commands. It did not work. Now you shall she (sic) 15 years of obligation. Of duty. Of role. Of leadership. Of teaching. Mentoring. Duty. Honor. Those that know me know. It's over, you have not seen the wrath of the Aryan that has no purpose left."

Doc 1 at 5.

In the context and circumstances in which these messages were posted (a chat dedicated to violent extremist ideology, neo-Nazis, and glorification of past mass shooters), Lightner's message was clear: he was informing his fellow RMVE-community members that he did not just want to advocate for the ideology, he intended to become a "saint" by committing a mass shooting himself, *i.e.*, Lightner's fellow chat members would one day soon be worshiping him for the mass shooting that he would soon carry out ("you have not seen the wrath of the Aryan that has no purpose left.")  Lightner was even specific about the type of ammunition he would use in his attack: .308 black tip ammunition. He went as far as to plan for the

3

aftermath of the attack, realizing that law enforcement would likely trace his online profile back to him after his mass shooting, writing: "When my @ says last seen a week ago remove me from everything."

And Lightner confirmed as much—voluntarily telling federal agents that he made the posts referenced above to illicit a response from the members of the group, to feel wanted by the community, and that the reference to "saint" was not just a vague reference to saints, but rather, a statement that *he* would become a "saint."

Lightner's identity as the poster of these threats and his intent behind his threatening messages was further solidified through the evidence found during a search of his residence.[2] From Lightner's bedroom, federal agents located a copy of Adolf Hitler's manifesto *Mein Kampf*. They also recovered an 88-page Mass Casualty Guide dedicated to recounting (and admiring) acts of mass violence. Not only did this printout include 118 references to "saints" and 25 references to "highscores," it also included a collective list of "saints"[3] who carried out mass acts of violence in furtherance of RMVE ideology and specifically listed their "highscores" (*i.e.*, the number of people they murdered).

This guide—which idolized mass shooters and encouraged others to follow their paths— also included summaries of other like-minded extremists and their

---

[2] On January 19, 2024, Judge Amanda Sansone signed a search warrant to search Lightner's residence. Federal agents searched Lightner's home on the very same day.

[3] Among others, the "Saints" listed include James Earl Ray (who murdered Martin Luther King Jr.), Timothy James McVeigh (the Oklahoma City bomber), and Robert Gregory Bower (the Tree of Life mass shooter).

plans to commit a mass shooting. For example, the Mass Casualty Guide included the following passage:

> Like Saint Breivik[4], I intend to cause maximum impact until I am physically prevented from continuing. That's why I planned my attack in detail, but left plenty of room to improvise. Keeping all options on the table, which only makes sense when attacking a target that's ALREADY chaotic and unpredictable. I raise my rifle and survey the crowd again, this time through the scope. Where should I start? I grit my teeth in disgust. Scrawny, shrieking masked faggots. Obese, blue haired land whales. Feral niggers breaking windows and beating people. Brainwashed race traitor cucks cheering them on. On the other side, vastly outnumbered mystery meat MAGA fags and assorted named-group shills who still believe in political solutions and still think they have rights. They're fucking clueless. Then there's the filthy pigs in their riot gear, "standing down" as per the mayor's orders, and only using "excessive force" against Whites who have the audacity to defend themselves. The system enforcers and system puppets are a false kike-agitated dichotomy, and these fake and gay riots only serve the system's anti-White agenda. I fucking hate them all. I'd like to put a bullet in every last one of them. Unfortunately that's too great a task for anyone man, but I brought 2000 rounds and I'll fire off as many as I can, until I'm captured or killed.

But the Mass Casualty Guide was not all federal agents found in Lightner's bedroom. They also located the very tools that the Mass Casualty Guide recommended for carrying out acts of mass violence. Federal agents recovered multiple rounds of .308 ammunition (the same ammunition Lightner claimed he would use) tucked into a plated vest (*i.e.*, a bulletproof vest) at the foot of Lightner's bed, two firearms (a .45-caliber handgun and a Smith & Wesson handgun), an unregistered firearm silencer—which fits on a .45-caliber handgun, and another

---

[4] This is a reference to Anders Breivik—a neo-Nazi who murdered 77 people in shootings and bombings in 2011.

pamphlet titled "MAC/SIONIC Sound Suppressor Technology." In other areas of the home, several rounds of ammunition and multiple other firearms—at least one of which used the very same .308 ammunition referenced in Lightner's threats—were located.

## II. Legal Standard

Under Federal Rule of Criminal Procedure 8(a), an "indictment . . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction." Rule 8(a) is construed broadly in favor of initial joinder, allowing joinder of offenses that "are of the same or similar character, even if such offenses do not arise at the same time or out of the same series of acts or transactions." *United States v. Hersh*, 297 F.3d 1233, 1241 (11th Cir. 2002) (citing Fed. R. Crim. 8(a)). Similar character means "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness." *Id*. 297 F.3d at 1241; *see also United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993)). Importantly, the offenses need only be similar in category, not in evidence. *Hersh*, 297 F.3d at 1241. Thus, "if offenses are of like class, although not connected temporally or evidentially, the requisites of proper joinder should be satisfied so far as Rule 8(a) is concerned." *Id*. at 1241 n.12. And when faced with a Rule 8(a) motion, the United States may proffer evidence establishing a connection between the charged offenses. *See United States v. Dominguez*, 226 F.3d 1235, 1238 (11th Cir. 2000).

A district court's decision not to sever counts will only be reversed if the

6

defendant can "demonstrate that he received an unfair trial and suffered compelling prejudice." *United States v. Walser*, 3 F.3d 380, 387 (11th Cir. 1993) "This is a heavy burden, and one which mere conclusory allegations cannot carry." *United States v. Slaughter*, 708 F.3d 1208, 1213 (11th Cir. 2013). The *Walser* Court summarized the test for assessing "compelling prejudice" as follows:

> [W]hether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own acts, statements, and conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict.

3 F.3d at 386–87 (11th Cir. 1993). The *Wasler* court also made clear that "some prejudice" is not sufficient to mandate severance—but rather, the defendant carries a heavy burden to go beyond mere conclusory allegations and show that he would receive an unfair trial and suffer compelling prejudice. *Id.* at 386.

### III. Analysis

#### a. The Two Counts Are Properly Joined Under Rule 8, Which is Construed Liberally

##### i. Count One and Count Two Are Similar in Character Because They Are Connected to The Same Goal

The offenses charged in the Indictment, threat to injure and possession of an unregistered firearm silencer, are properly joined because they are connected to the very same goal: Lightner's commission of a mass shooting. *Hersh*, 297 F.3d at 1241.

Both the words used in Lightner's threatening messages ("saints", "high score", "wrath", "Aryan", "ammunition", "death", and "duty") and the evidence

7

found in Lightner's bedroom (including the firearm silencer) are specifically referenced Lightner's Mass Casualty Guide. For instance, the document directs its fellow RMVE readers to "make your fellow **Saints** proud to call you brother. From the moment you **shoot**, detonate, or otherwise engage your targets, you will join their sacred brotherhood." *Id*. at 72 (emphasis added).

In one portion of the printout—which ends with a quote from "Saint" Benton Tarrant (an Australian extremist who murdered 51 people in two mosques in New Zealand)—the Mass Casualty Guide advocates for violence that terrorizes "racial enemies", results in an eternal "high score", and leads to "sainthood:"

> Only through ACTION can a man forge such a legacy, unbound and everlasting. Through struggle and sacrifice; through raging fires and rivers of enemy blood, the ordinary White man ascends to **Sainthood**. He is Immortal. No matter his fate in the physical realm, his ultimate Sacrifice for our People is eternal. **High scores** are eternal. The gunshots that ring out he mag dumps into his targets; the deafening BOOM of a successful detonation; the screeching tires against asphalt and enemy flesh during a vehicular attack - THE SOUNDS OF CHAOS - echo eternally. The terror he inflicts upon our racial enemies is eternal. The courage and drive he instills in his White brothers is eternal. Hatred begets hatred. Violence begets violence. And, when done right, **Sainthood** begets **Sainthood….** One spark - one Man - choosing the righteous path of HOLY TERROR and stacking the bodies to God.

*Id*. at 69 (emphasis added). The Mass Casualty Guide also references "**Aryan** warrior(s)" and makes clear that the ideologies' ultimate goal is to "return to a world where the **Aryan** man rightfully exercises his power over the filthy dregs of the lesser continents"—through "divine wrath through holy terror". *Id*. at 32, 72, 78. It further makes clear that the way to leave a "legacy" is to die following the commission of a

8

mass casualty event. *Id*. at 3 ("**Death** is permanent. The **points** (*i.e.*, high score) you earn cannot be rescinded. If you want to make a lasting impact, Leave behind a legacy the system can't erase."). Lightner's threats, which mirror the tone and exact verbiage used in the 88-page Mass Casualty Guide, were plainly molded by the rhetoric of the document.

Just as Lightner's word choice was influenced by the document, so too were the weapons and materials Lightner planned to use in his violent attack. In Lightner's home, federal agents located firearms, a bullet proof vest, a firearm silencer, and ammunition—each of which was specifically referenced in this violent printout. *See id.* at 41 ("obtain a **firearm** by any means necessary"); *Id*. at 78 ("I go inside, **fill my plate carrier** with loaded mags, and reload the empty ones…. The chaos has spilled into this intersection too, naturally, but they don't expect **gunfire** from here."); *Id*. at 49 ("Look man, we're brothers in arms now. You can trust me. I do explosives, **ammunition**, and our guys in general specialize in combat.").

Most pertinent to the underlying motion, the document glorifies the anonymity that firearm silencers—which, according to Lightner, is "more appropriately called a suppressor" (Doc. 34 at 1)—provide, and touts the benefits of using unregistered firearms with unregistered suppressors to circumvent detection. Indeed, the Mass Casualty Guide states:

> I unscrew the **suppressor** - a marvelous work of art if you ask me, a "stupid rattlefest that's louder than an unsuppressed .22LR" if you ask the inconsiderate faggot in charge of the radio. What matters is it gets the job done and I wouldn't like to be seen with it still fastened to the

> muzzle of my firearm. That would trigger a butterfly effect of misdemeanors and felonies ranging from discharging a firearm within city limits - oh, so Tyrese can do it for his dumb rap video, but I can't do it to feed myself? - **to having an unregistered suppressor slapped onto an unregistered firearm -** the latter of which isn't illegal yet, but I'm sure the feds would find a way.

*Id.* at 41 (emphasis added).

Put simply, Lightner's 88-page Mass Casualty Guide was the blueprint for his own act of mass violence. It explained how those in the RMVE community plan their attacks, the weapons and tools that should be used, and the "legacy" that conducting such an attack will leave behind. Logic follows that Lightner's threats (Count One), and the materials found in his bedroom (including the firearm silencer, Count Two) are not just "somewhat alike"—they are both intrinsically connected to Lightner's ultimate plan to commit a mass shooting.

The connection between both counts is bolstered by Lightner's own conduct and admissions. Indeed, when asked if Lightner knew why the Federal Bureau of Investigations ("FBI") was executing a search warrant at his home, he plainly stated: "Telegram." Knowing the FBI was at his home to search for evidence relating to his threatening posts he made on the online messaging platform, Lightner's first instinct was not to delete his messages or remove the online messaging application from his electronic devices—it was to throw the unregistered firearm silencer into his laundry hamper. If Lightner connected his threats on Telegram and the unregistered silencer together, there

10

can be no question that Count One (interstate threat to injure) and Count Two (unlawful possession of a firearm silencer) are properly joined. *See Hersh*, 297 F.3d at 1241.

> ii. <u>Joinder is also Proper Because the Evidence Supporting both Counts is Intrinsically Linked.</u>

Even setting aside Lightner's statements and the circumstantial evidence demonstrating that Lightner was the person making the threats, the offenses charged are further connected because, under Eleventh Circuit precedent, the United States must demonstrate that Lightner intended his communications to serve as threats. *See United States v. Alaboud*, 347 F.3d 1293, 1297 (11th Cir. 2003) (explaining that "[t]he fact-finder must look at the context in which the communication was made to determine if the communication would cause a reasonable person to construe it as a serious intention to inflict bodily harm"), *overruled on other grounds by Elonis*, 575 U.S. at 726. And while the United States agrees with Lightner that that it need not *prove* that Lightner meant to carry out his threat, *see Virginia v. Black*, 538 U.S. 343 (2003), that does not mean Lightner's intention and ability to do so is irrelevant to the jury's determination of whether his words constitute a true threat.

A defendant's knowledge or intent usually is "inferred from circumstantial evidence." *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994). A court also must be mindful that to act with knowledge "is not

11

necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question." *United States v. Hristov*, 466 F.3d 949, 952-53 (11th Cir. 2006).

In analyzing such evidence, Courts have concluded that evidence pertaining to a defendant's ideological sympathies and access to firearms are intrinsic to the crime charged in Count One, as this evidence provides the jury with necessary context for Lightner's threats and was relevant to prove an element of the offense. Indeed, in *United States v. Springer*, 753 F. App'x 821, 828 (11th Cir. 2018), the Eleventh Circuit affirmed the district court's decision to admit evidence that the defendant supported a foreign terrorist organization in a prosecution for threatening to murder a federal judge. The Court explained that the defendant's support for a foreign terrorist organization was relevant to establishing that the defendant had meant "'to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals' –and not mere hyperbole." *Id.* (quoting *Virginia v. Black*, 538 U.S. 343, 359-60 (2003)). The Court further explained:

> Taken out of context, Springer's outlandish threats to murder the district court judge by strapping a bomb to a drone and crashing it into her chambers could easily be viewed as nothing more than angry hyperbole. But when viewed alongside the evidence of Springer's sympathies toward ISIS, it becomes far more plausible that Springer's threats were "a serious expression of an intent to commit an act of unlawful violence" against the district court judge. *See Black*, 538 U.S. at 359-60. Thus, the ISIS-related evidence was intrinsic to the crime charged in

12

>Count One, as it provided the jury with necessary context for Springer's threats and was relevant to prove an element of the offense.

*Id.* (some internal citations omitted).

In *United States v. Baker*, 514 F. Supp. 3d 1369, 1383 (N.D. Fla. 2021), the Court admitted evidence that the defendant possessed firearms when the defendant made several threats that conveyed his intent to use force to commit acts of violence and perpetrate several kidnappings. *Id*. at 1379.  In analyzing whether the defendant *intended* his communications to serve as threats, the Court relied on, among other things, the fact that "[t]he Defendant owned two firearms, which he kept loaded with ammunition." *Id*. at 1383. The Court explained that, although the defendant's threats did not specifically reference the word "firearm," "his possession of the firearms indicates that the Defendant had a means to carry out his threats, and thus that it was more likely he actually intended his messages as threats." *Id*. That was true, the Court opined, because the phrase "every caliber available" suggests that the Defendant and his "militant friends" will be armed with firearms. *Id*. at 1379.

The reasoning of *Spring* and *Baker* control here. Out of context, Lightner's threats may be viewed as an angry hyperbole. But when viewed alongside the evidence of Lightner's RMVE-ideology and the evidence found in Lightner's bedroom, it becomes far more plausible that Lightner's threats were "a serious expression of an intent to commit an act of unlawful violence." *Black*, 538 U.S. at 359-60. What's more, from the word choice used by Lightner—including the reference to .308 ammunition—the jury is free to infer that Lightner intended to use

13

firearms to carry out his threats. That inference is bolstered by Lightner's possession of the Mass Casualty Guide, firearms, ammunition, a bullet plated vest, and a firearm silencer, an instrument designed to reduce the noise level of a fired weapon and prevent law enforcement and victims from determining where a gunshot was fired. After all, when taken together, this evidence provides valuable context to Lightner's intention behind his threatening messages and indicates that he had the means to carry out his threat.[5]

The inverse is also true. Proving Count Two of the Indictment requires that the United States demonstrate that Lightner "knowingly possessed" the firearm silencer. *See* 26 U.S.C. § 5861. The United States must prove this, beyond a reasonable doubt, through direct or circumstantial evidence. *United States v. Greer*, 440 F.3d 1267, 1271 (11th Cir. 2006). Meeting this burden necessarily requires the introduction of evidence that Lightner (not his brother, sister, or dad) possessed the unregistered firearm silencer.  And the evidence connecting Lightner to the firearm silencer (*i.e.,* the Mass Casualty Print out referencing unregistered firearm silencers, his participation in the RMVE-inspired chats, the other firearms and bullet plated vest) is the very same evidence that the United States must introduce to demonstrate that Lightner was also the person making the online threats and planning to carry out his attack. The judicial efficiency of trying both counts together—particularly when

---

[5] Even if this Court were to assume, for sake of argument, that, as he contends (Doc. 35 at 2), that Lightner made the silencer when he was twelve-years old, that does not change the fact that the firearm silencer—irrespective of its age—was an integral part of Lightner's plan to commit a mass shooting.

the same evidence and underlying facts prove key elements of both offenses—counsels against severance.

For his part, Lightner relies on *United States v. Philibert*, 947 F.2d 1467, 1470-71 (11th Cir. 1990) and *United States v. Himelwright*, 42 F. 3d 777, 783 (3d Cir. 1994). But in doing so, Lightner is comparing apples and oranges. After all, neither case analyzes whether counts should be severed—they opine on whether evidence should be excluded under Federal Rule of Evidence 404(b).[6] And the decision cited by Lighter that does permit severance, *United States v. Beard*, No. 3:20-CR-0567-B, 2022 WL 1321550, at *4 (N.D. Tex. May 3, 2022), also does little work.

In *Beard*, the defendant was charged with murder and the possession of an unregistered firearm silencer. *Id*. In support of its conclusion that the murder charge and unregistered firearm charge should be severed, the Court focused on the fact that "the Government does not contend that there is any relationship between the silencer underlying Count One and the murder underlying Counts Two and Three other than its coincidental discovery during the murder investigation." *Id*. at *3.

That is not the case here.  As explained above, there is nothing coincidental about Lightner's possession of a firearm silencer, his threats, or his plan to carry out those threats. Accordingly, the joinder of Counts One and Two is proper under Rule 8(a). *See Hersh*, 297 F.3d at 1241; *Walser*, 3 F.3d at 385; *see also United States v.*

---

[6] Moreover, both are factually distinguishable. In both cases, the crux of the Court's analysis was that there was little, if any, evidence that the Defendant's threatening messages and his coincidental purchase of firearms were related. *See Philibert*, 947 F.2d at 14370; *Himelwright*, 42 F.3d at 785.

15

*McIntosh*, No. 13-cr-18, 2016 WL 695742 (N.D. Ga. Jan. 6, 2016) (concluding that joinder was proper when the defendant threatened to kill the President and also unlawfully received firearms); *see also United States v. Higgs*, No. 8:19-CR-293-CEH-CPT, 2022 WL 1522119, at *4 (M.D. Fla. May 13, 2022) (concluding that joinder is proper even when the firearms charged in Counts 8 and 9 were different firearms than those used in the double homicide because they are same or similar in character); *United States v. Christy*, No. 3:18-CR-223, 2019 WL 636981, at *5 (M.D. Pa. Feb. 14, 2019) (the Court finds it plausible that the "common scheme or plan" involved Defendant first making threats, as alleged in Counts 1-4, and then committing the crimes alleged in Counts 5-12 in order to evade capture as to those threats); *United States v. Sampson*, No. 05-cr-11, 2006 WL 533377 (W.D. Va. Mar. 2, 2006) (determining that joinder of the threat and perjury charges was proper because the defendant allegedly threatened individuals in order to avoid his successful prosecution for perjury).

      b. <u>Severance is not Required Because no Compelling Prejudice to Lightner Exists, and any Potential Prejudice can be Cured by a Limiting Instruction.</u>

Lightner's assertion of prejudice falls far short of showing specific, compelling prejudice that would require severance pursuant to Rule 14. *See United States v. Miller*, 255 F.3d 1282, 1289 (11th Cir. 2001) (finding that defendant's "general allegation of some prejudice" did not meet the "heavy burden of demonstrating ... specific and compelling prejudice as a result of the denial of severance"). At best, Lightner's perceived prejudice is "general prejudice"—that his possession of an unregistered

16

firearm would give rise to a "negative" inference regarding his intentions in making his threats. Doc. 35 at 10.

But that argument does not pass muster here. For the reasons explained above, evidence related to Lightner's possession of an unregistered firearm would be admissible even if the only charge in the Indictment were interstate communication of a threat. Similarly, as detailed above, the evidence of Lightner's plans to commit a mass shooting would be admissible at a trial if the Indictment only charged unlawful possession of a firearm silencer. Thus, no prejudice that would necessitate severance exists. *See United States v. Watson*, 866 F.2d 381, 385 (11th Cir. 1989) ("A defendant is not able to show the requisite prejudice if evidence of the second offense joined in the indictment would be admissible without being separately charged"); United States v. Taylor, No. 5:23-CR-123-TPB-PRL, 2024 WL 987526, at *2 (M.D. Fla. Mar. 7, 2024) (finding severance was not appropriate when the evidence would be admissible); *see also United States v. Hollis*, 971 F.2d 1441, 1447 (10th Cir.1992) (finding no abuse of discretion where, "had separate trials been granted, the evidence of similar conduct would likely have been admissible anyway").

And whatever "negative inference" does exist (Doc. 35 at 10), could be cured by a limiting instruction. *United States v. Lopez*, 649 F.3d 1222, 1234–35 (11th Cir. 2011) (severances need be granted only if there is a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury from making a reliable judgment about guilt or innocence' even if limiting instructions are given.); *Springer*, 753 Fed. Appx. At 829 (concluding a limiting

17

instruction mitigated any unfair prejudice).

## IV.  CONCLUSION

The United States respectfully requests that the Court deny Lightner's Motion and decline to sever Count Two from Count One of the Indictment.

Respectfully submitted,

ROGER HANDBERG
United States Attorney

By:  */s/ Lindsey Schmidt*
Lindsey Schmidt
Assistant United States Attorney
United States Attorney No. 222
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: lindsey.schmidt@usdoj.gov

U.S. v. Alexander Lightner                                  Case No. 8:24-cr-21-WFJ-CPT

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Samuel Landes
Federal Public Defender's Office
400 N Tampa St, Suite 2700
Tampa, FL 33602-4726
Email: Samuel_landes@fd.org

/s/Lindsey Schmidt
Lindsey Schmidt
Assistant United States Attorney
United States Attorney No. 222
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: lindsey.schmidt@usdoj.gov