UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                             CASE NO.  8:24-cr-21-WFJ-CPT

ALEXANDER LIGHTNER

**UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

The United States hereby responds to the Defendant's, Alexander Lightner's, Motion to Dismiss Count Two of the Indictment, which charges him with possession of an unregistered silencer, in violation of 26 U.S.C. § 5861. The crime charged in Count Two of the Indictment falls within Congress's enumerated powers and does not run afoul of the Second Amendment. Accordingly, the Court should deny Lightner's Motion.

**MEMORANDUM OF LAW**

I.   **Factual Background**

The United States' Response to the Defendant's Motion to Sever (Doc. 36) contains a detailed discussion of the evidence to be presented at trial. Doc. 36 at 2-15. That discussion is incorporated herein by reference.

As relevant to the instant motion, Lightner threatened to commit a mass shooting in furtherance of his white supremacist ideology. A search of Lightner's home revealed that he had the ability, means, and intent to carry out his threat, to include firearms, ammunition, an illegal firearm silencer, a bulletproof vest, and a

mass-shooting instructional manual that described how these items could be used to inflict mass casualties.

As to the unregistered firearm silencer (which forms the basis for Count Two of the Indictment), that silencer was found in Lightner's laundry hamper. It was then sent to the Federal Bureau of Investigations' ("FBI") lab for testing. The results of that examination revealed that the silencer recovered from Lightner's bedroom bears no serial number or other markings of commercial manufacture. Further, a review of the National Firearm Registration and Transfer Record revealed that no records registering a firearm silencer (or any firearms for that matter) to Lightner.

Lightner voluntarily spoke to federal agents, telling them that the firearm silencer belonged to him and that he had thrown the silencer in the hamper upon realizing that law enforcement was at his house. He also admitted that he knew it should have been registered with the National Firearms Registration and Transfer Record, but that he chose not to do so.

## II.   Legal Standard

The relevant part of the National Firearms Act ("NFA") states, "It shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). The NFA defines "firearm" to include "any silencer as defined in section 921 of 18 U.S.C. 921." *See* 26 U.S.C.§ 5845. And under 18 U.S.C. § 921, a firearm includes "a firearm muffler or firearm silencer." Registering a firearm requires the payment of a $200 tax; identification of the firearm to be registered; and

identification of the applicant—including fingerprints and a photograph. 26 U.S.C. §§ 5811, 5812, 5821, 5822.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008), the Supreme Court held that the Second Amendment's right to keep and bear arms protects an individual's right to possess and use a firearm for lawful purposes, such as self-defense within the home. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022), the Court held that the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home."

### III.    Analysis

#### A.    The Second Amendment does not Guarantee the Right to Possess an Unregistered Firearm Silencer.

The plain text of the Second Amendment is clear: the Second Amendment only protects the right of the people to "keep and bear arms." Exactly what constitutes "arms" and to "keep and bear arms" under the Second Amendment has been explained by the Supreme Court. *See Heller*, 554 U.S. at 581; *Bruen*, 597 U.S. at 21.

As to "arms", the Supreme Court has explained that "[t]he 18th-century meaning is no different from the meaning today." *Heller*, 554 U.S. at 581. Then, dictionaries defined "arms" as "weapons of offense, or armour of defence," and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to

cast at or strike another." *Id*. Today, "arms" are similarly defined as "a means (such as a weapon) of offense or defense." *See* Arm, MERRIAM-WEBSTER (March 23, 2024). And the Supreme Court held that "arms" includes "all [modern] instruments that constitute bearable arms," not just those that existed when the Second Amendment was adopted. *Heller,* 554 U.S. at 582.

As to the plain meaning of "keep arms," under the Second Amendment, the Court explained that the phrase "means to have [or possess] weapons." *Id*. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Id*. at 584. When read together, to "bear arms" "refers to carrying for a particular purpose—confrontation," or self-defense. The Court in *Heller* explained the instrument must be one an individual could "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* In other words, the Second Amendment's right "to keep and bear Arms" protects an individual's right to carry or possess a bearable weapon for self-defense.

Applying these definitions, several courts have concluded that a firearm silencer is not a *bearable arm* subject to Second Amendment protection. *See United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment."); *U.S. v. Stepp-Zafft*, 733 F. App'x 327 (8th Cir. 2018) (noting other courts have rejected the argument that the Second Amendment protects

4

silencers "on the ground that silencers are not typically possessed by law-abiding citizens for lawful purposes"); *U.S. v. Al-Azhari*, No. 8:20-cr-206, 2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ("The Court finds that a silencer is not a bearable arm within the meaning of the Second Amendment."); *see also United States v. Berger*, No. 5:22-CR-00033, 2024 WL 449247, at *16 (E.D. Pa. Feb. 6, 2024) (denying defendant's motion to dismiss because a silencer is not an "arm" under the Second Amendment);

And that makes sense. After all, a firearm silencer does not serve any intrinsic self-defense purpose, and it is not an instrument that constitutes a bearable weapon. *See Heller,* 554 U.S. at 582. Unless one is to club another person with the silencer itself, a silencer has no offensive or defensive capability until it is attached to a gun. Silencers, therefore, are not "bearable arms" within the meaning of the Second Amendment.

Attempting to avoid this consensus, Lightner argues that *Bruen* abrogates each of these cases because the Government must show that the "regulation of silencers is part of a historical tradition of firearm regulation." Doc. 34. at 8. But Lightner's argument misconstrues *Bruen*.

To begin, Lightner insinuates that *Bruen* was the first time the Supreme Court held that weapons commonly used for self-defense fall within the scope of the Second Amendment. Doc. 34. at 4. It was *Heller*, not *Bruen*, that first articulated the self-defense standard in determining that the Second Amendment conferred an individual right. *See Heller*, 554 U.S. at 628 (explaining that "the inherent right of self-

defense has been central to the Second Amendment right"). And importantly, *Bruen* did not reject *Heller*, it just "made the constitutional standard endorsed in *Heller* more explicit." *See Bruen*, 597 U.S. at 31. *Bruen* merely reiterated that there is no "'right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id*. at 21 (quoting *Heller*, 554 U.S. at 626).

The standard articulated by *Bruen* for applying the Second Amendment is: first, "[i]n keeping with *Heller*, … when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; and, second, if a challenged regulation burdens such presumptively protected conduct, the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 24.

Here Lightner's challenge is foreclosed at step one. To determine whether the Second Amendment's plain text covers an individual's conduct, this Court must determine whether the challenger is "part of 'the people' whom the Second Amendment protects," whether the weapon at issue is "'in common use' today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment. *Bruen*, 597 U.S. at 31–32.

Lightner, at the time of his offense, was part of "the people," but unregistered silencers are not in common use today for self-defense and his course of conduct does not fall within the Second Amendment. Starting with the in-common-use requirement, several circuit courts have recognized that silencers are not "typically possessed by law-abiding citizens for lawful purposes." *U.S. v. Bolatete,* 977 F.3d 1022

6

(11th Cir. 2020) ("Neither this Court nor the Supreme Court has ever held that silencers are typically possessed by law-abiding citizens for lawful purposes."); *U.S. v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (noting other courts have rejected the argument that the Second Amendment protects silencers "on the ground that silencers are not typically possessed by law-abiding citizens for lawful purposes"); *U.S. v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) ("Silencers, grenades, and directional mines are not 'typically possessed by law-abiding citizens for lawful purposes,' ... [and] are therefore not protected by the Second Amendment."); *see also United States v. Beaty*, No. 6:22-CR-95-PGB-DCI, 2023 WL 9853255, at *8 (M.D. Fla. Jan. 20, 2023) (citing *Bruen* and concluding that a silencer is not subject to Second Amendment protection); *United States v. Peterson*, Crim. A. No. 22-231, 2023 WL 5383664, at *2 (E.D. La. Aug. 21, 2023) (concluding that silencers are not protected by the Second Amendment "even in light of *Bruen* or its progeny."); *Cox v. United States*, No. CR11-00022RJB, 2023 WL 4203261, at *7 (D. Alaska June 27, 2023) (Applying *Bruen* and concluding that silencers are firearms are not subject to second amendment protection); *United States v. Villalobos*, No. 3:19-CR-00040-DCN, 2023 WL 3044770, at *13 (D. Idaho Apr. 21, 2023 (finding that post-*Bruen*, silencers are not protected by the Second Amendment.").

    According to Lightner, these decisions are belied by Judge Willett's concurrence in *Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023). That is true, Lightner claims, because a silencer "facilitates the self-defense of one who is armed"

7

and thus, are in common use oday. Doc. 34 at 7.

But Lightner's reliance on *Mock* is misguided. In fact, the *Mock* concurrence doesn't actually help him. Indeed, Judge Willett opined that "rearward attachments, besides making a pistol less concealable, improve a pistol's stability, and thus a user's accuracy", which makes the weapon safer. *Id*. at 588. Because a rearward attachment makes the weapon safer, Judge Willet explained that it is distinguishable from weapons—like "smooth bore weapons (and for that matter, explosives, grenades, and poison gas)." *Id.*

A silencer, on the other hand, does not "promote safety"—it makes a firearm more dangerous. *See, e.g.*, *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (finding silencers even more dangerous than machineguns, for "[s]ilencers ... are not 'typically possessed by law-abiding citizens for lawful purposes,' and are less common than either short-barreled shotguns or machine guns"); *United States v. Beaty*, No. 22-cr-95, at 19–20 (M.D. Fla. Jan. 20, 2023)  ("[S]ilencers render weapons more unwieldy, more difficult to conceal, and minimize the noise which frightens and thus disorients the notional assailant.").  Indeed, the "Mass Casualty Guide" recovered from Lightner's residence (Doc. 36-1) demonstrates that he knew the nefarious uses to which silencers could be put, and intended to use his silencer to enhance the efficacy of a mass shooting that he was plotting. That Guide states:

> I unscrew the **suppressor** - a marvelous work of art if you ask me, a "stupid rattlefest that's louder than an unsuppressed .22LR" if you ask the inconsiderate faggot in charge of the radio. What matters is it gets the job done and I wouldn't like to be seen with it still fastened to the muzzle of my firearm. That would trigger a butterfly effect of

> misdemeanors and felonies ranging from discharging a firearm within city limits - oh, so Tyrese can do it for his dumb rap video, but I can't do it to feed myself? - **to having an unregistered suppressor slapped onto an unregistered firearm -** the latter of which isn't illegal yet, but I'm sure the feds would find a way.

*Id*. at 41 (emphasis added).

Put simply, "*Bruen* has not changed the fact that silencers are considered dangerous and unusual weapons and are not protected (explicitly or implicitly) by the Second Amendment." *Villalobos*, 2023 WL 3044770, at *13.

Turning to the proposed-course-of-conduct requirement, the NFA does not prohibit the possession of a firearm silencer—it prohibits only the *unregistered* possession of a silencer. The plain text of the Second Amendment does not say that the right to keep and bear arms cannot be "burdened in any way," but that it shall not be "infringed." Administrative burdens that stop far short of disarming law-abiding citizens do not "infringe" the right to keep and bear arms. *See* Webster's American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder").

Indeed, *Heller* and *Bruen* make clear that, while the United States cannot *prohibit* the in-home possession and public carrying of firearms for self-defense purposes, "the Second Amendment allows a 'variety' of gun regulations." *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring); *see also id.* at 72 (Alito, J., concurring) ("Our holding decides nothing about … the requirements that must be met to buy a

9

gun ... Nor have we disturbed anything that we said in *Heller*... about restrictions that may be imposed on the possession or carrying of guns."). Likewise, *Bruen* expressly left undisturbed the "shall issue" licensing laws in 43 states. *Id*. at 38, n.9. And Justice Kavanaugh's concurrence emphasized that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 90. The NFA imposes requirements no more burdensome than those of "shall-issue" licenses.

At bottom, the Second Amendment does not protect Lightner's possession of an *unregistered* firearm silencer, and Lightner's Second Amendment challenge necessarily fails at step one.[1]

Even if the Court were to proceed to the second step of the *Bruen* analysis, Lightner's constitutional challenge still fails because regulation of the possession of

---

[1] Following *Bruen*, most federal courts considering Second Amendment challenges address the common-use issue at step one of the analysis. *See, e.g., United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("Bruen step one ... requires a textual analysis, determining whether the challenger is part of the people whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment." (citation and internal quotation marks omitted)); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir.) ("Rahimi's possession of a pistol and a rifle easily falls within the purview of the Second Amendment. The amendment grants him the right to keep firearms, and possession is included within the meaning of keep. And it is undisputed that the types of firearms that Rahimi possessed are in common use, such that they fall within the scope of the amendment. Thus, Bruen's first step is met, and the Second Amendment presumptively protects Rahimi's right to keep the weapons officers discovered in his home." (internal quotation marks and citations omitted)), cert. granted, 143 S. Ct. 2688 (2023); *Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, No. 22-CV-01815, 2023 WL 4541027, at *5 (D. Or. July 14, 2023) ("To determine whether the conduct at issue is covered by the plain text of the Second Amendment, a court must determine whether the weapon in question is a 'bearable arm' that is 'in common use today for self-defense.' If the weapon is in common use today for self-defense, then the Constitution presumptively protects that conduct." (citations omitted)).

silencers is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As *Bruen* makes clear, "[h]istorical tradition can be established by analogical reasoning, which 'requires only that the government identify a well-established and representative historical analogue, not a historical twin.'" *Id.* at 30. "Regulations targeting longstanding problems must be distinctly similar to an historical analogue, but modern regulations that were unimaginable at the founding need only be relevantly similar to one." *Id.* (internal quotations omitted). Ultimately, the "central considerations" of the historical inquiry are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29.

To start, in *United States v. Miller,* 307 U.S. 1, 180 (1939), the Supreme Court engaged in historical analysis demonstrating the Nation's history of regulating the permissible length of firearms in the context of the militia. *See also* ("The musketeer should carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length"; "Every officer and soldier shall appear … armed … with a good, clean musket … three feet eight inches long in the barrel").

More broadly, "colonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 Law & Contemp. Probs. 55, 76 (2017). "A 1631

11

Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." *Id.* at 685 n.18. And other colonial governments "controlled the conditions of trade" in firearms. *Id.* at 685.

Like these early laws, the NFA's registration requirements for silencers do not prohibit possessing them. Instead, the statute merely imposes record-keeping and payment requirements to document the firearms. Although the statutes are not identical to those historical regulations, *Bruen* explained that the government need only identify a "historical *analogue*, not a historical *twin*." *Id.*, 597 U.S. at 30. And in this case, the practice of the colonies of regulating commerce in firearms provides an acceptable historical analog.

Moreover, as one district court explained, "silencers have been regulated by Congress for the same period of time and for the same purpose as sawed-off shotguns and machineguns." *United States v. Comeaux*, No. 6:23-CR-00183, 2024 WL 115929, at *3 (W.D. La. Jan. 10, 2024). So, too, have firearm silencers been perceived by the American public as dangerous shortly after they were patented in 1908. *Id*. The states of Maine and New Jersey both banned their sale or possession almost immediately thereafter. *Id*. And by the time the NFA was enacted, at least 15 states had imposed restrictions on their sale or possession. *Id*. Today, 8 states and the District of

Colombia ban the possession of firearm silencers altogether. S*ee* Cal. Penal Code § 33410; Del. Code. Ann. Title 11, § 1444; D.C. Code § 22-4514; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1(a)(6); Mass. Gen. Law. ch. 269, §10A; N.J. Stat. Ann. § 2C:39-3(c); N.Y. Penal Law §§ 265.02, 265.10; 11 R.I. Gen. Laws Ann. § 11-47-20

With this history in mind, the NFA's requirement that silencers be registered is "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Bruen*, 597 U.S. at 30. Thus, Lightner's constitutional challenge fails.

**B.    The Eleventh Circuit has Foreclosed Lightner's Argument that the NFA is Unconstitutional**

Lightner's next argument, that Congress lacks enumerated power to criminalize his possession of a silencer since the NFA operates as a penalty rather than a tax, has been squarely rejected by the Eleventh Circuit's decision in *United States v. Bolatete*, 977 F.3d 1022, 1033-34 (11th Cir. 2020).[2]  In *Bolatete,* the defendant was convicted of violations of 26 U.S.C. §§ 5861(d) and 5871 due to his possession of a silencer, and, like the Defendant here, he contended that the NFA exceeded Congress's taxing power. *Id.* at 1033. The Eleventh Circuit disagreed—specifically

---

[2] Much of Lightner's argument is based on the Supreme Court's decision in *Nat'l Fed. Of Indep. Bus. ("NFIB") v. Sebelius*, 567 U.S. 519, 567 (2012). But *Bolatete* was decided after *NFIB* and expressly considered *NFIB*, and that decision is binding on this Court. *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (holding that "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc").

13

finding that "[t]he National Firearms Act, and the criminal penalty for violating it, are grounded in Congress' power to tax." *Id.* at 1035.

Given that the NFA falls within Congress's enumerated powers, the Court should not dismiss Count Two of the Indictment.[3]

## IV.  CONCLUSION

For the foregoing reasons, the Court should deny the Defendant's motion to dismiss.

                          Respectfully submitted,

                          ROGER HANDBERG
                          United States Attorney

By:   */s/ Lindsey Schmidt*
        Lindsey Schmidt
        Assistant United States Attorney
        United States Attorney No. 222
        400 N. Tampa St., Ste. 3200
        Tampa, FL 33602-4798
        Telephone: (813) 274-6000
        Facsimile: (813) 274-6358
        E-mail: lindsey.schmidt@usdoj.gov

---

[3] In addition to constituting a legitimate taxing measure, some circuits have upheld the NFA on interstate commerce grounds. *See United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994) ("The NFA can be upheld on the preserved, but unused, power to tax or on the power to regulate interstate commerce"); *United States v. Jones*, 976 F.2d 176, 184 (4th Cir. 1992)("there can be no serious contention that the[ ] application [of § 5861(d)] in this case to two machineguns which were transported between two states for sale exceeds Congress' power to regulate interstate commerce"); *see also United States v. Stewart*, 451 F.3d 1071, 1078 (9th Cir. 2006) (statute criminalizing possession of homemade machineguns manufactured intrastate was not unlawful extension of Congress' commerce powers, even if machineguns never traveled in interstate commerce).

U.S. v. Alexander Lightner                                                    Case No. 8:24-cr-21-WFJ-CPT

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Samuel Landes
Federal Public Defender's Office
400 N Tampa St, Suite 2700
Tampa, FL 33602-4726
Email: Samuel_landes@fd.org

                                                */s/Lindsey Schmidt*
Lindsey Schmidt
Assistant United States Attorney
United States Attorney No. 222
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: lindsey.schmidt@usdoj.gov