## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No. 8:24-cr-21-WFJ-CPT**

**ALEXANDER LIGHTNER**

_____/

### MOTION TO SUPPRESS

**NOW COMES** Defendant, Alexander Lightner, by and through undersigned counsel, and moves this Court to suppress any statements made by Mr. Lightner when he was arrested.

### MEMORANDUM OF LAW

### FACTS

Alex knew something was wrong when he heard the concern in his father's voice. At 1:26 p.m. on January 5, 2024, Alexander Lightner was asleep at home, napping because he had not slept well the night before. Mr. Lightner lived in the home with his father, mother, and brother. He awoke to hear his father say, "Whoa, whoa, whoa. What's this? Are these people here for us?" What his father heard was a law enforcement officer with a loudspeaker demanding, "Lightner family, please come to the front door!"

Mr. Lightner threw on a shirt and a pair of shorts and walked out of his room barefoot. He found that his family was outside, and exited the front door himself. Outside he was met by what he thought was an MRAP – a Mine-Resistant, Ambush

Protected armored vehicle, repurposed from military use to law enforcement use. The MRAP was pulled as close to the front door as it could get without being inside the house, and was equipped with what appears to be an approximately 10-foot battering ram.   Behind the MRAP was a number of unmarked law enforcement vehicles.  At least four officers in military-style camouflage tactical uniforms, body armor, and combat helmets stood outside the front door with rifles aimed into the house, in front of the MRAP.  The Lightners' doorbell camera captured the beginning of the encounter, though the agents turned it off as soon as they were able:



Responding to instructions shouted on the bullhorn, Mr. Lightner exited his home, and an officer pointed a rifle at his head.  An officer ordered Mr. Lightner to turn around and walk backwards toward him.  As Mr. Lightner walked backwards,

he saw several other officers in their tactical gear with their rifles drawn on him. After he walked backward a few steps, an officer handcuffed him and searched him. He saw that his brother and father had already been handcuffed.

An officer brought Mr. Lightner to a marked Sarasota County Sheriff's Office (SCSO) SUV and placed him in the backseat.  He could see that his father and brother were outside the SUV, accompanied by several officers.  The SUV he was in was blocking the street he lived on, so that no one could use the street to come or go. He sat in the SUV for about 15 to 20 minutes.

An FBI agent took Mr. Lightner from the SCSO SUV and brought him to an unmarked SUV.  The agent removed Mr. Lightner's handcuffs and placed him in the SUV's passenger seat.  There was already another agent in the backseat, and the agent who moved Mr. Lightner from the SCSO SUV sat in the driver's seat.  Both agents were armed.  The agents were Special Agent David Tyus and Special Agent Richard Volp.  One of the agents asked Mr. Lightner if he would like to talk to them, and Mr. Lightner said he would.  The agents did not provide Mr. Lightner with his *Miranda* rights.  The agents asked Mr. Lighter questions about his alleged offenses, and Mr. Lightner provided incriminating statements.

When the interview concluded, an agent took Mr. Lightner from the SUV and left him in the street.  Mr. Lightner was not handcuffed, but an agent told him to stay where he was.  He no longer saw his family members.  One or more agents always stayed with Mr. Lightner.  Several hours went by, and Mr. Lightner told the agent he

3

needed to use the bathroom.  Two officers escorted Mr. Lightner to a wooded area and stood about three feet behind him while he urinated on the ground, still barefoot. When he finished, the officers walked him back to where he had been waiting before. By this time the sun had gone down and it was chilly in January, and Mr. Lightner started shivering.  One of his officer-escorts noticed, and asked Mr. Lightner if he could get him a jacket from the house.  Mr. Lightner said yes, and told the officer where he could find one of his jackets.  This officer left to talk to a supervisor and returned with a jacket for Mr. Lightner about 40 minutes later.  Then, Mr. Lightner asked for water and an agent gave him water.  Later, an agent brought him a chair to sit on.

About three or four hours after the MRAP parked in the front yard, an agent brought Mr. Lightner to ATF Agent Dino Balos's vehicle, and placed him inside. Agent Balos read Mr. Lightner his *Miranda* rights.  Then Agent Balos said, "Do you understand what I've read to you?"  Mr. Lightner responded that he did.  Next, Agent Balos said, "Are you cool to have a conversation?"  Mr. Lightner responded, "Uh, I'd probably rather not speak, but I am interested in what --."  Agent Balos told him that if he ever did not want to continue talking, "you just say I don't want to talk, I want a lawyer, say I want a lawyer."

Next, Agent Balos began interrogating Mr. Lightner.  He began by asking if Mr. Lightner was OK, and then explained the purpose of ATF.  Then, Agent Balos asked Mr. Lightner about a homemade firearm silencer FBI agents had found in the

house.  Agent Balos asked, "Has it ever been fired?"  Mr. Lightner replied in the negative, "Hmm-mm."  Agent Balos then asked how long ago the silencer was made.  Mr. Lightner responded, "I'd rather talk to a lawyer."  Agent Balos said, "OK," and Mr. Lightner said, "Yeah."  Agent Balos said, "OK," again.  The interrogation was recorded, and Mr. Lightner's tone of voice was firm and unequivocal.

Then, Mr. Lightner immediately changed the subject, suggesting that Agent Balos might recognize him because he was the victim of a shooting.  Mr. Lightner described his being shot and his break-up with his ex-girlfriend, and the pair discussed shootings in general.  Mr. Lightner said that he does not like thinking about things like that.  Next, there was a nine-second pause in the conversation.  Agent Balos said, "What are you thinking about?  Tell me."  Mr. Lightner responded, "I was wondering if I am getting arrested, I guess."  Agent Balos said that he was not getting arrested.  Mr. Lightner responded that he woke up to an MRAP at his front door, and, "It's all just a lot.  But I understand why you guys are all here, so … I did that to myself."  Agent Balos asked Mr. Lightner how old he was, and what his mother and father would think about "all this."  Mr. Lightner said that his parents are probably not too happy, but that he thought they would understand that he had been going through a great deal of stress.

Next, Agent Balos asked, "If you had a time machine, would you do things different?"  Mr. Lightner said, "Hmm.  So many things."  He said he would not care

about girls until he was older, because doing so led him to problems.  After some more discussion about Mr. Lightner's romantic woes, Agent Balos asked, "Do you want some advice, Alex?"  Mr. Lightner said he would.  Agent Balos said, "Yeah, I mean we're cool we're still talking you know, right?"  Mr. Lightner responded, "Yeah, OK."  After that, Agent Balos asked Mr. Lightner what he thought his neighbors must be thinking about all the FBI agents being there, and asked him again about the "time machine."  Then, Agent Balos asked Mr. Lightner if he would use a time machine to "stop" the "electronic communications" that were the subject of the FBI's visit.  Mr. Lightner said he would, and made other admissions about his online communications.  Agent Balos suggested that Mr. Lightner write a letter of apology, and he did.

The letter of apology was written on a picture of the homemade silencer, which led to a discussion of the silencer.  Mr. Lightner said, "I know I said I wouldn't talk.  I made this when I was 12."  Agent Balos responded, "So the way it works is if you reinitiate like you did, continue talking.  You remember that?  That's called a reinitiation.  So we're allowed to if you reinitiate, we can continue talking."  Mr. Lightner thereafter made more admissions.

Later, there was this exchange:

Agent Balos:  So Alex, have we had a good conversation?

Mr. Lightner:  I think so.

Agent Balos:  Did I yell at you?

6

Mr. Lightner:  No.

Agent Balos:  Did I threaten you?

Mr. Lightner:  Nope.

Agent Balos:  Did I make any promises to you?

Mr. Lightner:  Hmm-mmm.

Agent Balos:  And you understood your rights?

Mr. Lightner:  Yeah.

Agent Balos:  First of all, you understand you're not under arrest?

Mr. Lightner:  Yeah.

Agent Balos:  But you understood your rights, the right to a free lawyer and the right not to talk to me?

Mr. Lightner:  Yep.

Agent Balos:  Right?  You agree that you restarted talking to me about the case?

Mr. Lightner:  Yeah.

Agent Balos:  So you're not later gonna say, "Oh, I didn't restart, you know?"

Mr. Lightner:  Right.

Agent Balos:  Makes sense?  That's a law.  You gotta, it's like that.  Sometimes people are frustrated.  They say stuff and then they restart.  The law says if they restart, we're good to go.  I'm just letting you know, man.  It's our job.  We have to know this.

7

Agent Balos elicited some more admissions from Mr. Lightner, and then let him leave the car, saying, "And then, again, you're not under arrest but can I ask you at least to just stick around and not walk away?  Is that reasonable?"

Mr. Lightner told an agent he was hungry, so an agent brought him pizza from Wawa.  Later, an officer brought Mr. Lightner some shoes.  Then the FBI arrested him and took him to jail.

## ARGUMENT

This Court should suppress the statements Mr. Lightner made to the FBI because they were taken during his custodial interrogation, without any warning about his rights, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Mr. Lightner's statement to ATF should be suppressed because Agent Balos continued the interrogation after Mr. Lightner invoked his right to counsel, without Mr. Lightner initiating a further interrogation or waiving his asserted right to counsel.

## I.  The FBI interrogation was unlawful.

*Miranda* "requires trial courts to 'exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel.'"  *United States v. Woodson*, 30 F.4th 1295, 1303 (11th Cir. 2022) (quoting *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010); citing *Miranda*, 384 U.S. at 444).  The *Miranda* warnings are required when the defendant is

in "custody." *Id.* (citing *Luna-Encinas*, 603 F.3d at 880). [1]  Courts use a two-step

process to determine whether a defendant was "in custody" for *Miranda* purposes.

*Id.* (citing *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)).  The first question is

"whether 'a reasonable person would have felt he or she was not at liberty to

terminate the interrogation and leave.'"  *Id.* (quoting *Howes*, 565 U.S. at 509).  If the

first test is satisfied, courts go on to ask "'whether the relevant environment presents

the same inherently coercive pressures as the type of station house questioning at

issue in *Miranda*.'"  *Id.* (quoting *Howes*, 565 U.S. at 509).  Both inquiries are

objective, considering "the objective circumstances from the perspective of the

'reasonable innocent person.'"  *Id.* at 1303-04 (quoting *United States v. Moya*, 74 F.3d

1117, 1119 (11th Cir. 1996)).  Courts do not consider the subjective beliefs of the

participants or third parties.  *Id.* at 1304.

    A. <u>A reasonable person in Mr. Lightner's position would not have felt free to leave.</u>

      To answer this first step of the inquiry, courts "examine 'all of the

circumstances surrounding the interrogation,' including the location and duration of

the questioning, statements made during the interview, the presence or absence of

physical restraints, and whether the person was released after the interview."  *Id.* at

---

[1] A second requirement to trigger *Miranda* warnings is that the defendant was subject
to "interrogation," but that was obviously the case here.  *See Rhode Island v. Innis*, 446
U.S. 291, 301 (1980).

1303 (quoting *Howes*, 565 U.S. at 509).  For example, in *United States v. Adams*, 1 F.3d 1566, 1574-75 (11th Cir. 1993), customs agents were following a plane suspected of drug smuggling.  When the plane landed, agents pulled a car in front of it, preventing it from rolling further.  *Id.* at 1574.  Agents forced the defendant at gunpoint to lay on the tarmac, and then searched him and made him sit near the plane.  *Id.*  One agent pointed a shotgun at the defendant while another searched the plane.  *Id.*  Agents took the defendant's suitcase and airline ticket, and told him to stay where he was when he asked to look at their helicopter.  *Id.*  Agents next put the defendant in the rear seat of their car and interrogated him.  *Id.*  They did not tell him he was free to leave and did not read him *Miranda* warnings.  *Id.* at 1574-75.  Agents interrogated the plane's pilot, and then let both of them walk away after between an hour and an hour and a half.  *Id.* at 1574.

Under these circumstances, the court held that the defendant was in "custody" under *Miranda*, and that his statements should have been suppressed.  *Id.* at 1575. *See also Jacobs v. Singletary*, 952 F.2d 1282, 1291 (11th Cir. 1992) (holding the defendant was "in custody" for *Miranda* purposes where she had just emerged from a car that had been fired upon after attempting to drive through a police roadblock, several officers had weapons drawn, and an officer with a shotgun "grabbed her" and placed her "in custody.").

Here, a reasonable innocent person in Mr. Lightner's position would not have felt free to leave.  Mr. Lightner left his home to find a squad of officers in military-

style uniforms, body armor, and combat helmets, with rifles pointed at him and an MRAP (or a similar tactical vehicle) parked on his front lawn equipped with a large battering ram.  Like in *Adams* and *Jacobs*, the encounter began with a dramatic show of deadly force, though even in those cases the show of force did not have the military character present here.  Next, Mr. Lightner was handcuffed and searched, like the defendant in *Adams*, and, like the pilot in *Adams*, Mr. Lightner's family was handcuffed in his presence.  Like the blocked airplane in *Adams*, the agents' SUV blocked Mr. Lightner's street.  Next, agents searched Mr. Lightner's home, as the agents in *Adams* searched the plane.  Next, agents put Mr. Lightner in their car and interrogated him, without telling him he was free to leave, as the agents did in *Adams*.  Unlike *Adams*, where the encounter lasted between only an hour and an hour and a half, the encounter in this case lasted between four and six hours – in January, from 1:26 p.m. to after sunset.  And, also unlike *Adams*, Mr. Lightner was not freed when the interrogation ended, but was subject to constant escort – reliant on the agents for food, water, warm clothing, a chair, and the privilege of urinating on the ground in their close presence – and then arrested.

The totality of the circumstances and each of the *Howes* factors – the location and duration of the questioning, statements made during the interview, the presence of physical restraints, and whether the person was released after the interview – favor a finding that a reasonable innocent person in Mr. Lightner's position would not have felt free to leave.  *See Woodson*, 30 F.4th at 1303 (citing *Howes*, 565 U.S. at 509).

11

A reasonable innocent person in Mr. Lightner's position would have believed he would have been tackled or shot if he tried to leave.

This case is not controlled by *Woodson*. There, a group of officers arrived at the defendant's home to conduct a search warrant in tactical gear. *Id*. at 1301. The defendant's brother opened the door for them, and the officers' weapons were drawn. *Id*. The officers' handcuffed the defendant's brother, and then placed him in the home's living room. *Id*. The officers located the defendant asleep in his room, but by this time they had holstered their weapons. *Id*. The officers handcuffed the defendant and brought him to the living room, where his family was. *Id*. About 20 minutes later, a detective arrived to conduct interviews, starting with the defendant's brother. *Id*. Because it was cold outside, and to gain some privacy, the detective "proposed" doing the interview in the police van parked in front of the residence. *Id*. The defendant's brother "agreed," left for the interview, and returned to the living room about 15 minutes later, no worse for wear. *See id*.

Next, the defendant "agreed to talk with the detective and followed him to the police van, uncuffed and without protest." *Id*. The defendant sat in the passenger seat, with detectives in the driver's seat and back seat. *Id*. The detective told the defendant "right away that he was not under arrest, that he was not charged with a crime, and that they were talking voluntarily." *Id*. The conversation began cordially but then became confrontational. *Id*. The defendant made admissions for "less than an hour," and then was released. *Id*. He was not arrested for another eight months.

*Id.*

The court held that a reasonable person in the defendant's position would have felt free to leave, reiterating twice that "the question may be close" and "is somewhat close." *Id.* at 1304-05.  The court began, "Most important is the explicit advice Woodson received at the beginning of the interview:  that he was not under arrest, that he was not charged with a crime, and that the conversation was voluntary." *Id.* at 1304.  The court explained, "Those words make a big difference. By way of comparison, we have held that when officers advise a defendant 'that he is free to leave and is not in custody,' we generally assume that he is not custody absent restraints 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" *Id.* (quoting *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)).  The court also relied on the fact that the defendant was not handcuffed during the interview, that he sat in the front passenger seat of the van, that there was no evidence the van's doors were locked, and that the van was not marked as a police vehicle. *Id.* at 1305.  Because of the closeness of the question, the court went on to provide an alternative holding under the second *Miranda*-custody step. *Id.*

The question in *Woodson* was close, and the evidence here weighs more heavily in favor of a finding that a reasonable person would not feel free to leave.  No one pointed a gun at the defendant in *Woodson*; here, Mr. Lightner faced a squad of agents in tactical gear with rifles trained on him, and an MRAP with a battering ram

in his front yard.  The defendant in *Woodson* was allowed to stay with his family in his living room before he was interviewed; Mr. Lightner was ordered out of his home, and then kept in the SCSO SUV and isolated from his family members, who were themselves handcuffed outside the home.  The defendant in *Woodson* saw that his brother was briefly interrogated first before being returned to the home and family unscathed; Mr. Lightner had no such reassurance.  The detective in *Woodson* "proposed" that the interview take place in the police van, and the defendant and his brother "agreed"; Mr. Lightner was given no such choice in the matter, and was simply taken to the police SUV to be interrogated.  The defendant in *Woodson* was not arrested until eight months after the interrogation; Mr. Lightner was required to wait outside, shoeless and cold, until he could be interrogated a second time by ATF and then arrested.  And lastly, the key fact on which the court relied in *Woodson* was that the defendant was expressly and immediately told that he "was not under arrest, that he was not charged with a crime, and that the conversation was voluntary."  *Id*. at 1304.  Evidence at an evidentiary hearing will show that Mr. Lightner was provided no such assurance by his interrogators.

This case is more like *United States v. Hashime*, 734 F.3d 278 (4th Cir. 2013), than *Woodson*.  In *Hashime*, a team of 15 to 30 agents equipped with a battering ram executed a search warrant at the 19-year-old defendant's home.  *Id*. at 280.  They banged on the door and yelled, "Open the door."  *Id*.  A family member let them in, and the officers "streamed into the house with their guns drawn."  *Id*.  Officers found

14

the defendant naked and asleep in bed, pointing their guns at him. *Id.* They took the defendant and his family outside in the chilly weather, the defendant in his underwear and several of his family members in nightclothes. *Id.* Then, officers allowed the family back into the living room, but no one was allowed to go anywhere without an armed guard, and the police controlled whether and when the defendant could go to the bathroom. *Id.* at 280-81. The defendant was given clothes but no shoes or socks. *Id.* at 280. The defendant was taken to an unfinished storage area of the basement, isolated from his family. *Id.* at 281. Officers assured the defendant "that he did not have to answer their questions and could leave at any time," but also made later statements inconsistent with these assurances. *Id.* at 281.

The court noted that the agents' assurances that the defendant was free to leave weighed against a finding of custody, but words like these should not be given "talismanic" effect. *See id.* at 284 (quotation omitted). The court also noted that the fact that the interrogation took place in the defendant's home weighed against a "custody" finding, but that both of these circumstances were well outweighed by the "larger setting," namely, that "the house was swarming with federal and state agents, [the defendant] was roused from bed at gunpoint, held with family members and not allowed to move unless guarded, and ultimately separated from his family and placed in a small storage room with two agents where he was questioned by investigators." *Id.* at 283, 285 (internal quotation omitted). On these facts, the court held that the defendant was "in custody" for purposes of *Miranda*. *Id.* at 285.

15

In many ways, the facts of this case are strikingly similar to *Hashime*:  the unexpected and overwhelming show of force, including the number of agents, the battering ram, and the agents pointing firearms at the defendant; the defendants being subjected to constant escort, reliant on agents for necessities like going to the bathroom and obtaining warm clothing; and the defendants' isolation from their family members, who were likewise subject to the agents' control and show of force. But in other ways, the evidence of custody is far stronger in this case than it was in *Hashime*.  The agents in *Hashime* had a battering ram, but the agents here had a battering ram attached to a tactical military vehicle pulled to the front door.  The defendant in *Hashime* was detained and interrogated in his home, while Mr. Lightner was kept outside and interrogated in the agents' SUV.  Mr. Lightner was handcuffed, but the defendant in *Hashime* was not.  And the defendant in *Hashime* was expressly told he was free to leave, but Mr. Lightner was not.  Given all of the circumstances, a reasonable innocent person in Mr. Lightner's position would not have felt free to leave.

B.  <u>The circumstances were inherently coercive.</u>

The second prong of the "custody" test asks "'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'"  *Woodson*, 30 F.4th at 1304 (citing *Howes*, 565 U.S. at 509).  This inquiry is drawn from a line of cases arising in the prison context.  *See Howes*, 565 U.S. at 509; *Maryland v. Shatzer*, 559 U.S. 98, 1113 (2010).

16

In those cases, the Supreme Court was asked to decide whether and how *Miranda* applied to a suspect who was serving a prison sentence during an interrogation that took place at the prison.  Holding that a prisoner is not normally "in custody" in these situations, the Court explained that the prison context is unlike "the paradigmatic *Miranda* situation – a person is arrested in his home or on the street and whisked to a police station for questioning."  *Howes*, 565 U.S. at 511.  The Court explained that, unlike the "paradigmatic" *Miranda* suspect, a prisoner's being asked questions in the prison does not "represent[] a sharp and ominous change" or a "shock [that] may give rise to coercive pressures."  *Id.*  In contrast to a prisoner, the Court wrote, "[a] person who is 'cut off from his normal life and companions' and abruptly transported to a 'police-dominated atmosphere' may feel coerced into answering questions."  *Id.* (quoting *Shatzer*, 559 U.S. at 106; *Miranda*, 384 U.S. at 456).

The Court continued, "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release."  *Id.*  And, "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of the sentence."  *Id.*

Here, the facts are far more like the "paradigmatic" *Miranda* situation than the prison interrogations at issue in *Shatzer* and *Howes*.  Surely, the military-like operation at Mr. Lightner's home represented a "sharp and ominous change" for Mr.

17

Lightner, and a "shock [that] may [have] give[n] rise to coercive pressures." *See id*. And, just as surely, Mr. Lightner was rather dramatically "cut off from his normal life and companions and abruptly transported to a police-dominated atmosphere . . . ." *Id.* (internal quotations omitted). The degree of control exercised by the agents in this case could lead a reasonable person "to be lured into speaking by a longing for prompt release." *See id*. And lastly, the objective circumstances present here could well have led a reasonable person to believe that the agents had "the authority to affect" Mr. Lightner's detention – particularly the question of whether he would be arrested at all. *See id*. The "relevant environment" in this case "present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*" because the circumstances were far more like the "paradigmatic" *Miranda* situation than the prison interrogations at issue in *Shatzer* and *Howes*. *See Woodson*, 30 F.4th at 1304 (citing *Howes*, 565 U.S. at 509).

Again, this question is not controlled by *Woodson*, because that case is materially distinguishable. All of the facts that distinguish *Woodson* on the "free to leave" prong also support a finding of inherent coercion: that agents pointed their rifles at Mr. Lightner while wearing military gear; that there was an MRAP on the front lawn with a battering ram; that Mr. Lightner was isolated from his family; that Mr. Lightner was directed to the SUV rather than invited there; that Mr. Lightner was required to wait outside without shoes or warm clothing; that he was reliant on the agents for food, water, and permission to urinate on the ground; and that he was

not told that he was "not under arrest, that he was not charged with a crime, and that the conversation was voluntary." *See id.* In *Woodson*, the court emphasized that the defendant "was not entirely 'cut off from his normal life' – in fact, he quickly returned to it. As it turns out, because he was not arrested until eight months later, Woodson was free to continue living the same life . . . despite his detailed confessions." *Id.* at 1306. Not so, here: Mr. Lightner was released from the SUV only to wait hours outside, isolated from his family, only to be interrogated a second time by Agent Balos, arrested, and taken to jail. The inherently coercive pressures in this case were greater than those present in *Woodson*, *Shatzer*, or *Howes*. Mr. Lightner was therefore in "custody" for *Miranda* purposes and, because he was not warned of his rights, his statements to the FBI agents should be suppressed.

## II. The ATF interrogation was unlawful.

Unlike the FBI agents, Agent Balos correctly recognized that Mr. Lightner was in *Miranda* custody, and so provided him with *Miranda* warnings. But Mr. Lightner invoked his right to counsel, and did not initiate a renewed interrogation or waive his previously asserted right. Instead, Agent Balos initiated the interrogation after Mr. Lightner invoked the right to counsel, by asking Mr. Lightner what he was thinking about, what his parents and neighbors would think about the investigation, and what he would do with a time machine.

### A. Mr. Lightner invoked the right to counsel.

To effectively invoke the *Miranda* right to counsel, "the suspect must

19

unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). A reference to counsel is ambiguous when "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel . . . ." *Id.* The inquiry is objective, *id.*, and requires a contextual inquiry of the circumstances, *see Medina v. Singletary*, 59 F.3d 1095, 1104-1105 (11th Cir. 1995) (citations omitted).[2] For example, the context of a defendant's statement can be so persuasive that even the answer "no" is ambiguous in response to the question of whether he wants to speak to police. *See Medina*, 59 F.3d at 1105. In considering the circumstances of the defendant's reference to counsel, courts consider the defendant's statements that "(1) *precede* an accused's purported request for counsel" or "(2) are part of the request *itself*," but "[3] an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 96, 99 (1984).

Here, considered in context under *Medina*, Mr. Lightner's statement "I'd rather talk to a lawyer" was an unambiguous invocation of the right to counsel. As reflected on the recording, Mr. Lightner's tone of voice was unequivocal and firm, and he immediately changed the subject to the question of how Agent Balos might

---

[2] *Medina* (and other cases cited herein) is a case about invoking the right to silence, but "[t]he law relating to requests for counsel and restrictions on further questioning parallels the law relating to requests invoking the right to remain silent." *Delap v. Dugger*, 890 F.2d 285, 294 n.9 (11th Cir. 1989), *abrogated on other grounds by Fry v. Pliler*, 551 U.S. 112, 119-120 (2007).

recognize him.  In context, Mr. Lightner's request was made following Agent Balos's prefatory instruction that, if Mr. Lightner ever did not want to continue talking, he should "just say I don't want to talk, I want a lawyer, say I want a lawyer."  Mr. Lightner did just as Agent Balos said.  Agent Balos's own reaction demonstrates that he himself – who is presumably among the "reasonable officer[s]" to which the objective *Davis* inquiry is directed – believed that Mr. Lightner had invoked the right to counsel.  Agent Balos responded, "OK," and Mr. Lightner reiterated, "Yeah," before Agent Balos again said, "OK."  Then, Mr. Lightner promptly changed the subject, indicating that the interrogation had ended because of his invocation of his right, and that he had re-directed it on his own terms.  And, revealingly, Agent Balos felt the need to explain to Mr. Lightner the concept of "reinitiation," and to induce Mr. Lightner to say that he had "restarted" the interrogation.  As explained in more detail below, "reinitiation" as a concept has no bearing unless and until the defendant invokes the right to counsel in the first place, as Agent Balos demonstrated he well knew.  The best evidence that a reasonable officer would believe Mr. Lightner had invoked his right to counsel is that *this* reasonable officer believed just that.  Mr. Lightner's statement that he would "rather" talk to a lawyer was no more than a polite usage meant to make his request less adversarial.  His meaning was quite clear, especially to Agent Balos.

To be sure, long after Mr. Lightner's invocation, Agent Balos induced Mr. Lightner to agree that he had understood his rights and chosen to "restart" the

interrogation.  But under *Smith*, Mr. Lightner's post-request statements cannot be used in an attempt to cast doubt on the clarity of his request for counsel.  Mr. Lightner made an unambiguous request for counsel, invoking his rights under *Miranda*.

B.  <u>Mr. Lightner did not initiate the renewed interrogation or waive his previously invoked right to counsel.</u>

The defendant, "having expressed a desire to deal with the police only though counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).  If the defendant has invoked the right to counsel, "courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."  *Smith*, 469 U.S. at 95 (citing *Edwards*, 451 U.S. at 485, 486 n.9).  The Supreme Court has explained,

> While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue.  There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation.  Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial

22

> relationship, will not generally "initiate" a conversation in
> the sense in which that word was used in *Edwards*.

*Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality opinion); *see also Christopher v. State of Fla.*, 824 F.2d 836, 844 n.21 (11th Cir. 1987) (noting at least eight justices agreed on this point in *Bradshaw*). The inquiry is whether the defendant "evinced a willingness and a desire for a generalized discussion about the investigation . . . ." *Bradshaw*, 462 U.S. at 1045-46 (plurality opinion); *see also Henderson v. Duggar*, 925 F.2d 1309, 1312 (11th Cir. 1991) (citing *Bradshaw*, 462 U.S. at 1045-46). A defendant has not "initiated" a renewed interrogation under *Edwards* by talking to the police about a subject only tangentially related to the investigation. *See Jacobs v. Singletary*, 952 F.2d 1282, 1294 (11th Cir. 1992) (holding the defendant did not initiate the interrogation by asking "Where are my children?" after her children had been removed from her upon her arrest).

Here, Mr. Lightner plainly did not "initiate" a "generalized discussion about the investigation" under *Bradshaw* by suggesting how Agent Balos might recognize him. Nor can there be any argument that he did so by telling Agent Balos about the circumstances of his being shot or his romantic woes. Nor did he "initiate" the conversation by saying "I was wondering if I am getting arrested, I guess." While that comment, considered entirely in isolation, might suggest "a willingness and a desire for a generalized discussion about the investigation," *see Bradshaw*, 462 U.S. at 1045 (plurality opinion), it was in response to Agent Balos's asking, "What are you

thinking about?  Tell me."  It was Agent Balos who "initiated" the generalized discussion, not Mr. Lightner.  Mr. Lightner's comment was a response to interrogation by Agent Balos, in violation of the *Edwards* bright-line rule against further interrogation following the defendant's invocation of the right to counsel.  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation" under *Miranda* as "express questioning" or "any words or actions on the part of the police (other than those normally attendant and custody) that the police should know are reasonably likely to elicit and incriminating response.") (footnotes omitted).

So it was Agent Balos, not Mr. Lightner, who re-initiated the interrogation. Having elicited Mr. Lighter's "I was wondering if I'm going to be arrested" response, Agent Balos continued to interrogate Mr. Lightner by asking him what he would do with a time machine, what his parents might think about the investigation, and what his neighbors might think about the investigation.  From there, Agent Balos engaged in a full-blown interrogation.  But Mr. Lightner never initiated a continued interrogation, he only wanted to talk about his shooting.  Because of this, Agent Balos violated the *Edwards* bar, and any of Mr. Lightner's statements following his invocation of the right to counsel should be suppressed.

Further, the Government cannot meet *Edwards*' second prong, a showing that Mr. Lightner knowingly and intentionally waived his previously asserted right to counsel.  *See Smith*, 469 U.S. at 95.  To be sure, Mr. Lightner continued answering Agent Balos's questions.  But "when an accused has invoked his right to have

counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484 (footnote omitted).  Agent Balos did nothing to confirm that Mr. Lightner wished to waive the right he had just asserted.  Instead, he simply continued interrogating Mr. Lightner and Mr. Lightner continued answering his questions, the very scenario that *Edwards* explained is not a waiver.  Mr. Lightner's statements following his invocation of the right to counsel should be suppressed for this second reason as well.

**WHEREFORE** the Defendant, Mr. Lightner, prays this Court will suppress the statements he made to FBI and ATF.

DATED this 14th day of June 2024.

> Respectfully submitted,
>
> A. FITZGERALD HALL, ESQ.
> FEDERAL DEFENDER
>
> */s Samuel E. Landes*
> Samuel E. Landes, Esq.
> D.C. Bar No. 1552625
> Assistant Federal Defender
> 400 North Tampa Street
> Suite 2700
> Tampa, Florida 33602
> Telephone:   (813) 228-2715
> Facsimile:    (813) 228-2562
> Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th of June 2024, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Lindsey Schmidt.

/s *Samuel E. Landes*
Samuel E. Landes, Esq.
Assistant Federal Defender