UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  Case No. 8:24-cr-21-WFJ-CPT

ALEXANDER LIGHTNER
_____/

**ORDER DENYING MOTION TO SUPPRESS**

This matter comes before the Court upon Defendant Lightner's Motion to Suppress, Dkt. 48. The Court held a hearing on the matter July 26, 2024. Further, the Court took cogent briefing from the parties. Dkts. 56, 64, 69, 70.

The interrogations or interviews of the Defendant are the subject matter of the motion to suppress. There were two interviews, both inculpatory. One was conducted by FBI Agents and was unrecorded. A second, recorded interview was conducted by an ATF agent after a device was found secreted in Defendant's bedroom and a preliminary review showed it to be a crude silencer. The first interview was without *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). The second interview included appropriate *Miranda* warnings.

As to the first interview, the Court finds this interview was non-custodial and not coerced. There was thus no need to provide *Miranda* warnings.

1

As to the second interview, the Government contends that proper warnings were given, and if the Defendant appeared to request counsel during the interview, he then quickly reinitiated the conversation with the ATF agent, which permitted the interview to continue. The Court agrees. The second, *Mirandized* and taped interview by ATF is not suppressed. The Defendant, after he ambiguously suggested a desire for counsel, immediately reinitiated the discussion with the ATF agent. The bar to the continued interview suggested by *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (custodial interrogation must stop if lawyer requested) is not present here. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1044–46 (1983); *United States v. Valdez*, 880 F.2d 1230, 1233–34 (11th Cir. 1989). Further, the clear record shows the second interview was, in any event, noncustodial.

The Motion to Suppress is denied. Both interviews are admissible.

**The Investigation**: In January 2024 the FBI obtained a search warrant from the Magistrate Judge in Tampa, permitting search of Defendant's residence in Venice, Florida. The affidavit alleged that the 26-year-old Defendant had an internet identity as "DEATH." Dkt. 70-1 at 23–27. DEATH a/k/a Defendant Lightner was repeating nazi-related murder threats on the internet, with antisemitic and racial overtones. *Id.* at 25–33. In short, very serious death threats were alleged to be made by Mr. Lightner. They appeared quite grave and alarming, and showed extensive

knowledge of firearms, mass murder terminology, etc.  Dkt. 70-1 at 31–35.  The postings suggested Defendant was going to commit a mass murder.

***Search, and First Interview:***   At the evidentiary hearing on the motion to suppress, the tapes of the January 5, 2024, search warrant execution were played. FBI Special Agent Herman was the first witness.  The FBI SWAT team employed an armored vehicle called a "bearcat."  Defendant referred to it as an MRAP.  It was an imposing armored personnel carrier-type vehicle, with a prominent salient ram in front, somewhat resembling a wheeled tank.  This precaution seemed wise given the nature of the potential threat.  At about 1:25 p.m., the SWAT team drove the bearcat up to the subject house and called on the loudspeaker for the Lightner family to come out.  Defendant's father and brother emerged first, following instructions to walk backward towards the bearcat with rifles aimed at them, where they were handcuffed.  The handcuffs were removed later, and these two were interviewed and released.

Sometime later the Defendant emerged.  Apparently, he was in bed and upon awakening with the noise he took a moment to hide the crude firearm silencer that he had in his bedroom.

Defendant came out of the house in the same backwards manner as instructed at gunpoint, and was then handcuffed.  He was barefooted wearing shorts and a t-shirt.  At some point the handcuffs were removed, but at all times he was in the

3

vicinity of law enforcement. They never left his proximity. He remained in front of the house for hours during that day mostly milling about. The SWAT team "cleared" the house and their inspection of the interior of the premises involved flying a drone throughout it.

Special Agent Volp of the FBI testified at the hearing. He was also the affiant on the search warrant. Agent Volp stated that his task was to interview Defendant. At this time, Volp knew that Defendant was the target of the investigation and Volp had presented probable cause to the Magistrate Judge that Defendant had issued severe threats of gun violence and murder in his alias name "DEATH." Agent Volp also knew at the time of the interview that several firearms and thousands of rounds of ammunition were found strewn about the house. Agent Volp also knew at that time that a crude, possible silencer had been found.

The Defendant was not in handcuffs at the time of the interview. The interview occurred in Volp's parked Chevrolet Equinox. Defendant was in the front passenger seat with Volp behind the wheel. Another Agent was seated in the rear seat. The interview happened over the course of two to two and one-half hours with two breaks. Volp testified that Defendant was told he was free to go, not under arrest, and was not required to speak to the agents. Dkt. 68 (Tr. Mot. to Suppress Hearing) at 36–37. The rough notes of the other agent who was in the Chevrolet's backseat state as a first, top entry: "Not under arrest – can choose to talk." Dkt. 67-2 at 1.

This entry is omitted in the Form 302 memorializing the interview. In the second interview the ATF Agent asked Defendant if he had been told earlier that he was "free to go." Dkt. 56-4 (Gov. Ex. 4, provided via thumb drive, *see* Dkt. 57. G.E. 4, hereafter) at 1:19–1:22, 5:59–6:06. Defendant answered, "basically yeah." *Id.* at 1:22.[1] Also, the curiosity exhibited by the Defendant in the second, taped interview suggests that he would act similarly in the untaped first. Thus, based upon the clear testimony of Volp, the rough notes, and the Defendant's own admission, the Court finds the Defendant was told by Special Agent Volp that he was free to go. This is a "fact of substantial importance" in assessing the issue. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).

Volp testified that the Chevrolet Equinox was unlocked. After the interview, Defendant stood around, waiting. Defendant was not handcuffed or restrained during or after the first interview. He was not physically touched during or after the interview.

Volp testified that Defendant would not have been permitted to reenter the house. The house was strewn with firearms and loose ammunition, and undergoing a search much of the day. At some point late in the afternoon it became cool, and an officer retrieved a jacket for Defendant from the house. Defendant needed to relieve

---

[1] Also, in the second interview the ATF agent asks, "That was you standing here when I pulled up?" G.E. 4 at 0:33–0:36.

himself so two officers walked with him to a side yard, which was too close to a nearby house, so they then walked with him to the edge of a wooded area where he relieved himself.

The Government's position that the Defendant was free to go and not under arrest at this time is consistent with law enforcement testimony at the hearing, although Agent Volp testified the Defendant was "escorted" by law enforcement at the scene of the search at all relevant times.

The Defendant testified at the suppression hearing. He testified that he never felt he was free to leave during the first interview. He was not shown firearms in the interview but believed the agents to be armed. He declined to open his phone for the agents. He stated that he asked for a lawyer during the first interview—the Court does not credit this. He asked for water and an Agent provided him with a bottle of water.

The Defendant testified that he was facing the front of his nearby house, in an unlocked car during the interview. He admitted that he said Volp told him he was free to leave, upon conclusion of the interview. Dkt. 68 at 73–76. When asked if Volp told him he was not under arrest, Defendant testified "I don't recall." *Id.* at 73. When asked if Volp told him that he did not have to speak with Volp, Defendant testified "I don't recall." *Id.* Defendant testified that his father and brother were also interviewed during that time. *Id.* at 74. They were never arrested. He testified

6

that he did not ask to depart the area; and that nobody made him speak—he could have declined to speak with Volp. *Id.* at 76.

The FBI arrested Defendant at roughly 8:30 p.m., well after the second interview. He had been standing around or participating in interviews since about 1:35 p.m., never departing and never far from law enforcement agents.

Although it is a close call, the Court finds that the Defendant was not in custody during the first interview. The Defendant was not in handcuffs. He did in fact stay free of handcuffs or any restraints (except for the short initial period) for hours. He did not see agents' guns when he was interviewed, although it is logical to think he was aware they were likely armed. He was in familiar surroundings. He did not ask to leave. His father and brother were interviewed and not arrested. Dkt. 68 at 74–76.

The Court relies upon the legal rules surrounding this analysis. Most importantly, the subjective views of the Defendant or officers are not relevant—the inquiry is objective. *Stansbury v. California*, 511 U.S. 318, 325–26 (1994); *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). The issue is what would *a reasonable innocent* person believe. *Florida v. Bostick*, 501 U.S. 429, 437–38 (1991); *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). And a reasonable, innocent person in these circumstances who was told by an FBI Agent

that he was free to leave, would believe that he was free to leave, *i.e.*, not be under arrest.

It may well be that this Defendant believed he was not free to leave and was quite subjectively reasonable in his belief. That is not the test, however. It is a simple fact that he was told he was free to leave (as he admitted later that day) and a reasonable innocent person in this situation would believe the same. Defendant's mother and sister did in fact come and leave during this time. Dkt. 68 at 40.

During the course of the long first interview (roughly two hours excluding breaks) the search had uncovered the alleged silencer, body armor at the foot of Defendant's bed containing .308 ammunition (matching an online reference to shootings), a rifle to match the ammunition, and a copy of *Mein Kampf* next to Defendant's bedside. The Agent asked Defendant about these items during the interview. And the Defendant had made inculpatory statements about the alleged online threats early in the interview. No doubt these items created a view in Defendant's mind that he was in serious jeopardy—likely creating the subjective conclusion that he was not free to leave. But that is not the issue and is not the test. *Moya*, 74 F.3d at 1119 ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

A reasonable innocent person, told he is free to leave by an FBI Agent, would believe it on the totality of these facts. Indeed, the Eleventh Circuit has held: "If the

8

individual being questioned were innocent, and was told directly he might leave, in the absence of evidence to the contrary the interrogation was non-custodial as a matter of law." *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000). Accordingly, the Court finds that Mr. Lightner was not "in custody" at the first interview. There was no formal arrest. And there was no "restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted).

*The Second Interview:* ATF was called to the scene once the putative silencer was found in a clothes hamper in Defendant's bedroom. This Agent was a highly skilled and experienced interrogator, affecting empathy throughout and asserting that he personally cared about the Defendant.

During the first interview the Defendant stated the silencer was his, and he made it ten years ago. Dkt. 67-2 at 3. He panicked and threw it in the laundry basket when SWAT came to the house. It fits on a .45 *Id.* at 4. He knew it was illegal. *Id.* at 5.

At approximately 6:30 p.m., the ATF agent encountered Defendant standing at the front of the house, and interviewed him inside a vehicle. Unlike the first FBI interview, this interview was taped. (G.E. 4.) The Defendant agreed to talk to the ATF Agent, who informed Defendant that he was not under arrest or in custody. G.E. 4 at 1:13–1:23. When the Agent asked, "Did they tell you, are you free to go?"

Defendant answered, "Basically yeah." *Id.* at 1:22. Defendant responded "Yeah" when asked if he had ever been advised of his *Miranda* rights. And the Defendant stated he knew what they were. *Id.* at 1:23–1:28. The Agent then gave Defendant his full and accurate *Miranda* warnings. *Id.* at 2:10–2:37.

At some point early on, relevant below, the Agent stated the Defendant looked familiar. This was a very brief conversation appearing to conclude the two were not acquainted.

The issue with the second interview is whether the Defendant invoked unequivocally his right to counsel or to remain silent and, if he did, whether he reinitiated conversation so as to obviate that invocation. There are two incidents on this tape where this is present and relevant. In both of them the Court concludes that the Defendant did not unequivocally invoke his right to counsel or to remain silent and did reinitiate conversation with the Agent. The Court discusses these issues here.

After receiving a full *Miranda* warning, the Defendant stated that he understood his rights. *Id.* at 2:37. The Agent then asked, "We're cool to have a conversation?" The Defendant then stated, "Uh, I'd probably rather not speak but I do, I am interested in what . . . ." The Agent immediately said "Okay" and then reminded the Defendant that at any time the Defendant can stop speaking. The Agent said, "Just say 'I don't want to talk'" or "I want a lawyer, say 'I want a lawyer.'"

10

"[I]t's a gentlemen's conversation." *Id.* at 2:37–2:52.  The Defendant then said "Yeah" then "Gotcha."  The Agent then started talking by saying "Are you okay?" *Id.* at 2:53–2:55.  A close listen to the tape shows this was not a clear invocation of the right to silence.  And then the Agent and Defendant began speaking again freely.

As to the second incident of possible "invocation," or "reinitiation," the Agent asked the Defendant about the silencer. *Id.* at 4:16–4:18.  The Agent asked, "Does it work, has it ever been fired?"  The Defendant appears to have responded in the negative with a humming noise. *Id.* at 4:11.  The Agent asked, "How long ago was it made?"  The Defendant said, "I'd rather talk to a lawyer." *Id.* at 4:18.  The Agent quickly says, "Okay alright okay."  But two seconds later, the Defendant said, "It is curious you might recognize me.  I don't know if you deal with shooting cases but I got shot three times . . ." and the conversation continues on describing the shooting of Defendant and how the Agent might have recognized him. *Id.* at 4:18–4:41.  The Defendant briefly invoked the right to counsel but, almost in the same breath, kept talking without coaching or enticement from the Agent, and described why the Agent may have recognized him due to a shooting.  *See United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir. 1986) (statement that came "in same breath" as invocation of counsel was admissible).  The conversation then continued on without any other issue directly, although these matters were referred to twice.

11

Defendant's mention of a lawyer when he was asked how long ago he made the silencer was an equivocal request for counsel. *See Davis v. United States*, 512 U.S. 452, 459 (1994) ("But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.") (emphasis in original). "[T]he suspect must unambiguously request counsel." *Id*. This mention of a lawyer was not an unambiguous invocation of counsel, any more than was "Maybe I should talk to a lawyer" in *Davis*, *supra*, at 455. And even if it were, the Agent acted appropriately, saying "Alright, okay." But the Defendant immediately reinitiated a flowing conversation about a shooting.

At 21:58 in the interview, the Defendant discussed the silencer while he was writing out a full confession. He stated, "I know I said [earlier in response to a question about the silencer] I wouldn't talk [but] I made this when I was twelve." G.E. 4 at 21:58–22:01. The Agent then stated "The way it works is, if you reinitiate, like you did continue talking, . . . if you reinitiate, we can continue talking." *Id.* at 22:05–22:14. The Defendant agrees—this is in the context of the Defendant writing out a confession about the silencer. *Id.* at 22:14–22:15.

Shortly into the interview the Defendant suggested he did not consider himself arrested yet. He stated, "I was wondering if I am getting arrested, I guess." *Id.* at

12

6:02.  This supports the Court's finding that neither the first nor second interview was custodial.  In the same vein, at the end of the second interview the Defendant also stated that he understood he is not under arrest, nor threatened or promised anything.  *Id.* at 28:58–29:14.  He agreed that he understood his rights and was not under arrest.  He agreed he restarted talking to the Agent about the case.  *Id.* at 29:20–29:24.  And he agreed that he will not leave the interview and say he did not restart discussion.  *Id.* at 29:24–29:28.

The Defendant stated at the end of this interview that the FBI did not tell him he could leave at any time.  *Id.* at 40:08–40:11.  The ATF Agent repeated Defendant was not under arrest.  *Id.* at 40:30.  The Agent asked the Defendant to "stick around" but stated that he could not require the Defendant to do so.  *Id.* at 40:30–40:40. The Defendant was formally arrested less than two hours later.

In addition to the *Miranda* related issues, the Defendant also argues in passing that notwithstanding any invocation or reinitiation, he simply did not knowingly and intelligently waive his right to silence.  The interviews show to the contrary.  This is an intelligent Defendant.  He is educated, well-spoken, articulate, and alert.  He was quite aware of the nature of the investigation, and that it related to his online threats and the unregistered silencer he had hiding in his clothes hamper.  His conversation makes clear he was very knowledgeable about firearms, and knew silencers were illegal unless properly registered.  At the time he received full, proper *Miranda*

13

warnings at the second interview, Defendant stated that he had been given *Miranda* rights before. Moreover, to establish a confession was involuntary the Defendant must establish police coercion. *Moya*, 74 F.3d at 1120. None was present.

Finally, as noted, the Court finds based on this record that the second interview was not custodial. The giving of *Miranda* warnings by the ATF Agent did not transform the interview into an arrest. The Defendant agreed to talk, was not restrained or shown the Agent's firearms, was told by the Agent he was free to go, and in fact remained at liberty for a lengthy period of time—about an hour to an hour and a half—after the second interview, until the decision to arrest was made later that evening.

The Motion to Suppress, Dkt. 48, is denied.

**DONE and ORDERED** at Tampa, Florida on October 31, 2024.

_____
WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE