UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                                    Case No. 8:24-cr-21-WFJ-CPT

ALEXANDER LIGHTNER
_____/

### SENTENCING MEMORANDUM

This Court should sentence Mr. Lightner to 18 months' imprisonment and three years' supervised release.

\*\*\*

In the evening of September 23, 2024, Alexander Lightner awoke to a missed phone call from his girlfriend, Olivia Mace. He saw that he had missed three or four other calls from her already. He also saw that she had sent him a video. The video showed Olivia with "a laceration from the middle of her chest basically down to her pelvis area[.]" Alex got in touch with her on the phone, and she was hysterical. She wouldn't say what had happened, but she asked him to come to her home right away. Alex grabbed a boot knife that he carried and his father's pistol and headed to Olivia's house.

When he arrived, Olivia was still hysterical, and hugged him. He couldn't gather from her what happened at first, but eventually learned that it was her brother, Malachi, who had injured her. Alex decided to confront Malachi by talking to him. He entered Olivia's home, where Malachi also lived, and went to Malachi's

bedroom, with the gun still holstered and concealed behind his shirt, and with the boot knife sheathed and concealed inside his pants. He opened the door and saw Malachi in bed – feigning sleep, as it would turn out. Alex said, "Hey Malachi," to wake him up. Malachi sat up abruptly and grabbed a gun that had been concealed by a pair of sweatpants, and pointed it at Alex. Alex turned around in the doorway to run away. Malachi shot Alex in the back three times: twice in his mid-section, and once closer to his neck. Alex collapsed on Malachi's bed, certain he would die. Exhibit 1.

***

Alex grew up in a loving and stable home with his parents, younger brother, and younger sister. His father is a retired military man and police officer. Alex grew up in Venice, Florida, where he graduated high school. He studied CAD drafting and served in the Civil Air Patrol. His father and he own a construction business together, and Alex became a skilled carpenter. Alex is only 27.

***

Alex's interest in firearms and construction came together when he was 12 years old and led him to commit the instant offense. He had learned welding at home, and found instructions for making a firearm silencer. He welded it together and kept it in his room. And there it stayed until he was arrested 15 years later. That is the offense of conviction.

***

Alex begged for water and for someone to call 911, bleeding profusely on the bed. He heard Olivia and Malachi debating what to do and what their mother would think. Eventually Olivia called 911 but couldn't speak, and a roommate joined the chaos and took the phone. Police and emergency services arrived, but they would not treat Alex because they did not know where the gun was. (Presumably Malachi or Olivia hid it). Eventually they decided the gun was not a threat to them, and treated him.

At the hospital, all told, Alex needed 11 surgeries. He had fractured vertebrae, collapsed lungs, a broken rib, abdominal adhesions, and more. At one point he was forgotten in a hallway and nearly died again. Doctors were able to remove two of the three bullets, but the third was lodged in his liver, a place too dangerous to operate. There it remains. Alex removed one more fragment himself, in the jail.

Alex had to learn to walk again. He repeatedly went back to the hospital, suffering from abdominal pain, vomiting, and an inability to eat. He went to the emergency room time and again. His liver is weak, so he is more susceptible to alcohol.

Predictably, the attack took a toll on his mental health as well. It gave him post-traumatic stress disorder, and led him to an alcohol problem as he self-medicated. He absorbed himself in the online world of Telegram, seeking out transgressive friends and ideas of many stripes, from Antifa to white supremacy.

Drunk at a bar and coming off a breakup with his girlfriend just after he had given her Christmas gifts, with the silencer safely at home, he sent the Telegram messages that formed the basis for the unproved, to-be-dismissed threat charge. There is no evidence that anyone in the like-minded chat group thought Alex was actually going to do anything violent, and no one who was not part of the group (other than an FBI mole) saw his communications. Some of the messages a different Telegram user deleted, and some he deleted upon sobering up.

      The Government shows stunning credulity in its view of the evidence. Everything, in the Government's view, should be viewed in the worst possible light: he definitely meant his words to be a true threat of a mass shooting; he was definitely going to commit a mass shooting; he agreed with the ideas in *Mein Kampf*; he agreed with the ideas in someone else's manifesto; the body armor, gun, and silencer in his room were there to kill people in a mass attack; the other guns and "thousands of rounds" of ammunition were his and also intended for murder; and so on. But if his Telegram posts were threats they were empty and meant to get attention; *Mein Kampf* was his father's and he never opened it – he shared a bedroom with his brother; he never read the draft manifesto (he's not a reader); the body armor, ammunition, and gun in his room were put there by his former-special-forces father because his son had been shot in the back three times and nearly died; the silencer was a harmless child's project; the other guns and "thousands" of rounds were from his father's collection and re-loading project; and so on. The Government located an "expert"

4

whose tepid opinion is that Alex was "interested" in committing mass atrocities. And Mr. Lightner located an expert whose opinion is that he was not – he was a keyboard warrior, not a real threat of violence. Indeed, Alex has no history of being violent. Frankly, the Court should give neither expert's opinion any weight – to the extent they say anything useful, they cancel each other out.

***

Perhaps understandably, Malachi Mace defended on self-defense grounds, since Alex had a gun and a knife when he came to the home. This despite video evidence from Olivia's phone showing that he said he would kill Alex *before* he and Olivia perpetrated the ruse that brought him to the home. Exhibit 2. But the jury hung and the court declared a mistrial. After the mistrial, Mace pled guilty and was sentenced to seven years' imprisonment.

Alex has spent his time in jail productively, learning Spanish from and teaching English to fellow inmates, and leading prayer circles in both languages. He leads exercise routines and counsels despairing defendants. His family is anxious to have him home, for his love, for his help with the business, and for his help repairing their home, damaged from the recent hurricanes.

## ARGUMENT

This Court should sentence Mr. Lightner to 18 months' imprisonment. The offense level is 15 and the criminal history category is I. The Court should sentence

Mr. Lightner at the low end of the guidelines range because of the nature of the instant offense and his history and characteristics.

**I. The guidelines range is 18 to 24 months' imprisonment.**

    A.  <u>The offense level is 15.</u>

The Telegram-related evidence is not relevant conduct. The four-level "in connection" enhancement does not apply because the alleged threats were not relevant conduct, and the silencer is not a "firearm" for purposes of the guidelines. The serial number enhancement does not apply, again because the silencer is not a "firearm" for purposes of the guidelines. The obstruction enhancement does not apply because Mr. Lightner did not willfully provide false testimony or materially hinder the investigation.

        1.  The Telegram-related evidence is not relevant conduct.

Under the header of "offense conduct," the presentence report includes all of the evidence relevant to Telegram and the to-be-dismissed threat charge: the Telegram texts, information about "Terrorgram," the weapons and literature in the house, etc. But this is not relevant conduct to the offense of conviction, possession of an unregistered silencer.

"Relevant conduct" is "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of *the offense of conviction*, in preparation for *that offense*, or in the course of attempting to avoid detection or

6

responsibility for *that offense*." U.S.S.G. § 1B1.3(a)(1)(A) (emphases added). There can be no serious argument that Mr. Lightner's online activity, possession of reading material, or possession of other weapons, ammunition or body armor, was done in preparation for or in the course of attempting to avoid detection or responsibility for the offense of conviction, the unregistered possession of the silencer he made when he was twelve. Nor was his online activity done "during" the offense of conviction, as that phrase has been interpreted by courts. *See United States v. Ritsema*, 31 F.3d 559, 566 (7th Cir. 1994); *United States v. Vargas-Garcia*, 434 F.3d 345, 348 (5th Cir. 2005); *United States v. Cruz-Gramajo*, 570 F.3d 1162, 1173 (9th Cir. 2009); *United States v. Loza*, 580 F. Appx. 229, 230-31 (10th Cir. 2014) (unpublished) (citing *Cruz-Gramajo*, 570 F.3d at 1167; *Vargas-Garcia*, 434 F.3d at 349-52); *cf. United States v. White*, 335 F.3d 1314, 1320 (11th Cir. 2003) (addressing a crime committed during an illegal reentry crime under the "avoiding detection" prong, not the "during" prong).

The Government takes pains to attempt to establish that Mr. Lightner's Telegram-related conduct was "part of the same course of conduct or common scheme or plan as" his possession of the silencer. Doc. 106 at 6-7. But that test applies "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts[.]" U.S.S.G. § 1B1.3(1)(B)(2). Mr. Lightner's silencer offense and his alleged threat offense would not group, so it is immaterial whether the "same course of conduct" or "common scheme or plan" tests are

7

satisfied. *See id.* § 3D1.2(d) (specifically excluding all offenses in Chapter Two, Part A); *id.* § 2A6.1 (providing the guideline for sending threatening communications under 18 U.S.C. § 875(c)).

    2. The "in connection" enhancement does not apply.

A four-level enhancement applies when "the defendant . . . used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). The enhancement does not apply here because (1) Mr. Lightner's alleged threat offense is not relevant conduct to his silencer offense, (2) a silencer is not a "firearm" for guidelines purposes, and (3) Mr. Lightner did not possess the silencer "in connection with" the alleged threats.

First, the enhancement does not apply because the alleged threats are not relevant conduct – for the reasons explained above. And, because they are not relevant conduct, they cannot be used as the basis for a specific offense characteristic enhancement. Specific offense characteristics are to be determined solely on the basis of relevant conduct. *See id.* § 1B1.3(a). Because the alleged threat is not relevant conduct to the silencer possession, it cannot form the basis for the enhancement.

Second, the silencer is not a "firearm" for these purposes. To repeat, the enhancement applies when the defendant "used or possessed *any firearm* or ammunition in connection with another felony." *Id.* § 2K2.1(b)(6)(B) (emphasis added). The starting point in interpreting a guideline is its text, often as informed by

dictionaries. *See United States v. James*, 135 F.4th 1329, 1334 (11th Cir. 2025). The word "firearm" has a well understood, clear meaning. "Firearm" means "[a] weapon that expels a projectile (such as a bullet or pellets) by the combustion of gunpowder or other explosive. – Also termed *gun*." *Firearm*, Black's Law Dictionary (12th ed. 2024).

"[Silencers] are not actual weapons. They cannot be fired or discharge projectiles. They are merely devices designed to attach to the barrel of a handgun or rifle in order to muffle the sound made when the weapon is discharged." *Ritsema*, 31 F.3d at 562 (footnote omitted). Because the silencer was not a weapon that could expel a projectile by the combustion of an explosive, it follows simply that the silencer was not a firearm. Indeed, this Court concluded as much when it denied Mr. Lightner's motion to dismiss. *See* Doc. 46 at 6 (collecting cases, including *United States v. Beaty*, No. 6:22-cr-PGB-DCI, 2023 WL 9853255, at *8 (Jan. 20, 2023) ("Simply put, a silencer is not a firearm, because it [is] not capable of expelling a projectile, and does not facilitate that purpose.")). The Government apparently agrees. *See* Doc. 37 at 4 (collecting cases, including *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself . . . ."), and writing, "Unless one is to club another person with the silencer itself, a silencer has no offensive or defensive capability until it is attached to a gun.").

9

To be sure, the guideline's *commentary* provides a cross-reference that would include silencers. *See* U.S.S.G. § 2K2.1 cmt. n.1. But Sentencing Guidelines commentary that purports to "interpret" an unambiguous guideline is due no deference. *See James*, 135 F.4th at 1336. There is nothing genuinely ambiguous about the word "firearm." There is therefore "no need to consider, let alone defer to, the Application Note . . . ." *Id.*

The Government points to the definition of "firearm" in Title 26, which indisputably includes silencers. Doc. 106 at 5-6. But it is a commonplace that the law may use different definitions for the same words. Indeed, when the Commission wishes to invoke the Title 26 definition of "firearm," in knows how to do it. For example, the base offense level in this case is provided by § 2K2.1(a)(5), which applies "if the offense involved a firearm described in 26 U.S.C. § 5845(a)." That is, the base offense level expressly refers to the Title 26 definition. Mr. Lightner thus has no quarrel with the base offense level – his silencer was certainly a "firearm" as described in Title 26. But in other places the guideline uses the term "firearm" *without* referencing the Title 26 definition. In those places, with no statutory definition, the plain English meaning controls. Thus, the same item may be a "firearm" for some purposes in the guideline and not a "firearm" for other purposes. *Cf. United States v. Nieves-Diaz*, 99 F.4th 1, 6, 9-10 (1st Cir. 2024) (holding that a "machinegun conversion device" was a Title 26 "machinegun" for purposes of the base offense level, but not a "firearm" for purposes of the enhancement). So the

10

silencer here is a "firearm" for purposes of the merits and the base offense level, but not for purposes of the enhancement.[1]

Third, Mr. Lightner did not possess the silencer "in connection with" his sending the Telegram messages from the bar. "[A] person possesses a firearm 'in connection with' another offense if the firearm possession is contextually, causally, or logically related to that offense." *James*, 135 F.4th at 1334. Generally, this requirement is met when the firearm at issue has the potential to facilitate the other offense. *See id*. Nothing about the crude silencer Mr. Lightner made when he was a child, safely in his bedroom, facilitated or had the potential to facilitate his sending poorly judged, drunken Telegram messages from the bar. The enhancement does not apply.[2]

---

[1] Curiously, the Government argues that the Court may wish to revoke Mr. Lightner's downward adjustment for accepting responsibility for having made this objection. Doc. 106 at 6. The Government points to no authority for the proposition that a defendant who has pled guilty and makes a purely legal argument in objecting to the presentence report forfeits the acceptance of responsibility reduction. *Cf.* U.S.S.G. § 3E1.1 cmt. n.2 (condoning the application of the adjustment where the defendant has *gone to trial* to assert a purely legal argument).

[2] Here, the Government invokes the commentary. Doc. 106 at 8 (citing U.S.S.G. § 2K2.1 cmt. n.14(A)). But the Government forgets *James*, which held that this commentary is due neither consideration nor deference in interpreting the phrase "in connection with." 135 F.4th at 1336-37. In the cases the Government cites, which pre-date *James* by more than two decades, it was rather obvious that the firearm at issue had the potential to facilitate another felony. *See United States v. Matos-Rodriguez*, 188 F.3d 1300, 1309 (11th Cir. 1999) (applying the enhancement where defendant carried a firearm while transporting counterfeit currency such that the firearm had the potential to protect the contraband); *United States v. Gainey*, 111 F.3d 834, 837 (11th Cir. 1997) (applying a similar enhancement where the defendant

11

3. The serial-number enhancement does not apply.

A four-level enhancement applies if "the defendant knew that *any firearm* involved in the offense was not otherwise marked with a serial number . . . or was willfully blind to or consciously avoided such fact[.]" U.S.S.G. § 2K2.1(b)(4)(B)(ii). Again, the word "firearm" is not defined so, again, its plain meaning controls. And, again, a silencer is not a "firearm." The enhancement therefore does not apply.

4. The obstruction enhancement does not apply.

A two-level enhancement applies "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense[.]" U.S.S.G. § 3C1.1. Like all enhancements, the Government bears the burden of proving the obstruction enhancement. *United States v. Ndiaye*, 434 F.3d 1270, 1300 (11th Cir. 2006) (citing *united States v. Cataldo*, 171 F.3d 1316, 1321 (11th Cir. 1999)). The Government asserts that Mr. Lightner willfully obstructed justice by (1) tossing the silencer in the laundry when the BearCat and SWAT team appeared at his door, (2) testifying at the suppression hearing that the FBI agents did not tell him he not under arrest and was free to leave, and (3) testifying at the suppression hearing that he

---

possessed a firearm that could protect his illegal drugs). No similar potential appears here, and the Government points to none.

requested a lawyer in rebuffing the FBI's efforts to get him to open his phone.  Doc. 106 at 10-12.

Mr. Lightner did not willfully testify falsely at the suppression hearing.  To begin with, Mr. Lightner simply did not testify that the FBI agents failed to tell him that he was under arrest, as the Government says; he testified that he could not remember one way or the other:

> Q.  And when you started speaking to Special Agent Volp, he told you that you weren't under arrest, didn't he?
>
> A.  I don't recall.

Doc. 68 at 73.

Next, Mr. Lightner did not willfully testify falsely that the FBI agents failed to tell him he was "free to leave."  First, this testimony was not false.  True, it contradicted the agent's testimony.  The FBI Form 302 memorializing the interview noted that the agents told Mr. Lightner that he did not have to talk to them and was not under arrest, but conspicuously failed to note whether they told him he was free to *leave*.  Gov. Supp. H'rg Ex. 1.  The agents' rough notes show that agents told him that he was not under arrest, but are again conspicuously silent on whether they told him he was free to *leave*.  Def. Supp. H'rg Ex. 7.  And when an ATF agent asked Mr. Lightner whether he had been told he was free to leave, he said, "*Basically*, yeah," Doc. 77 at 10 (emphasis added), meaning only that was the gist of what he was told.  Of course, the Government could have easily proven the historical facts if it had

13

recorded the interview, but the agent decided not to record it.  Doc. 68 at 37-38, 48-51.

Second, the Government cannot show that any falsity in this testimony was willful.  "In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  *Id.* § 3C1.1 cmt. n.2.  Mr. Lightner could perhaps be forgiven for mistaking or forgetting whether he was told (1) he was not under arrest, (2) he was not required to answer questions, and (3) he was free to leave, or only some combination of the three, more than six months after the event in question.  At the least, the Government cannot prove otherwise.

Next, Mr. Lightner did not willfully testify falsely that he asked for a lawyer.  The Court chose not to credit Mr. Lightner's testimony that he requested a lawyer, but also found by a preponderance that he rebuffed the agents' efforts to get him to open his phone.  Doc. 77 at 14.  The Government must show, by a preponderance of the evidence, that Mr. Lightner was not mistaken or forgetful about precisely *how* he rebuffed the agents' efforts.  This the Government cannot do.

Lastly, the enhancement does not apply to Mr. Lightner's tossing the silencer into the laundry because his doing so did not materially hinder the investigation.  The enhancement applies to

14

>destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender.

U.S.S.G. § 3C1.1 cmt. n.4(D). The Government makes no argument that Mr. Lightner's tossing the silencer into the hamper materially hindered the investigation, nor could it – the agents found the silencer in minutes.

Instead, the Government argues that the "material hindrance" standard does not apply because the hamper toss was not contemporaneous with Mr. Lightner's arrest. That is, the Government says, though Mr. Lightner immediately tossed the silencer upon the arrival of the BearCat, the Government took another seven hours to search the house, interview his family, and interrogate him twice before arresting him formally. Doc. 106 at 12-13.

The Government's argument is not supported by caselaw and, instead, caselaw contradicts it. *See United States v. Savard*, 964 F.2d 1075 (11th Cir. 1992). In *Savard*, a customs agent became suspicious of a boat docked in Naples, Florida, and boarded it. *Id*. at 1076. Sometime soon after, a defendant secreted an important boarding slip in his shoe. *Id*. The agents obtained the three crewmembers'

15

identification. *Id.* Then, one agent left the boat to verify its information, while another questioned each of the three crewmembers, questioning one member twice. *Id.* Next, the agents searched the boat, finding 567 pounds of marijuana, and performed field tests on the drugs. *Id.* at 1077 & n.2. Then, the agents read the men their rights and arrested them. *Id.* Upon arrest, an agent found the boarding slip in the defendant's shoe. *Id.* The court held that the defendant's act of hiding the boarding slip in his shoe could not support the obstruction enhancement, applying the "material hindrance" standard because the act was contemporaneous with his arrest. *Id.* at 1078-79.

Here, the facts are strikingly similar to *Savard*. Like in that case, the agents conducted a continuing investigation, starting with ordering the family out of the house, and moving to interviewing the family, interviewing Mr. Lightner (twice), searching the home for around seven hours, and only then arresting Mr. Lightner. Like in *Savard*, Mr. Lightner's purportedly obstructive act came at the beginning of the police presence, once he was aware of it. Like in *Savard*, the act was contemporaneous with the arrest and, like in *Savard*, it did not materially hinder the investigation. The enhancement does not apply.[3]

---

[3] Puzzlingly, after Mr. Lightner's arrest, and after his testimony at the suppression hearing, the Government executed a plea agreement with him in which it promises to recommend a reduction for acceptance of responsibility. Doc. 92 at 4. But "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1 cmt. n.4. Conversely, that

16

B. <u>The criminal history category is I.</u>

The presentence report applies one criminal history point for a prior sentence for "driving/participating in drag racing" and "reckless driving, damage to person or property with alcohol," for which he was sentenced to 12 months' probation. PSR ¶ 39. This prior sentence does not score because it is "similar to" reckless or careless driving and speeding. The Guidelines limit the application of this rule for sentences in a list of "prior offenses and offenses similar to them, by whatever name they are known . . . ." *Id.* § 4A1.2(c). A sentence for a prior offense on the list is included only if "(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense[.]" *Id.* § 4A1.2(c)(1). The list includes "careless or reckless driving." *Id.* A second list is for offenses "and offenses similar to them" that are always excluded. *Id.* § 4A1.2(c)(2). This list includes "minor traffic violations (e.g., speeding)." *Id.*

Mr. Lightner's prior sentences were for offenses "similar to" careless or reckless driving and speeding. His Florida reckless driving conviction is quite obviously "similar to" reckless driving. That there are minor differences in the elements between the particular form of reckless driving Mr. Lightner committed and other offenses is of no moment; the offenses must only be "similar to" each other, "by whatever name they are known," not identical. Mr. Lightner was not sentenced

---

Mr. Lightner is entitled to the acceptance of responsibility reduction is strong evidence that he is not subject to the obstruction enhancement.

17

to more than one year of probation or more than 30 days imprisonment, so the reckless driving prior sentence does not score. And the drag racing conviction is "similar to" both careless or reckless driving and speeding, so it does not score.

The Government again takes refuge in the Guidelines' commentary. Doc. 106 at 14. But the Government again fails to consider cases like *James* and *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc), which control whether the commentary is owed any consideration. The commentary is only owed consideration when the guideline's text is "genuinely ambiguous." *See James*, 135 F.4th at 1333. There is nothing "genuinely ambiguous" about the phrase "similar to" or "by whatever name they are known." There is therefore no reason to consider, of for that matter defer to, the commentary. *See id*. at 1336. The prior sentence does not score.

## II. The nature of the offense and Mr. Lightner's history and characteristics should lead to a low-end sentence.

Alex is only 27 years old. He has a very limited criminal history. He has a bright future, bolstered by his strong work ethic, supportive family, and already established construction business. His felony conviction disarms him for life. He is the type of person who learns Spanish in jail and teaches others English. His offense was to keep in his possession a silencer he made as a child, one he never used to harm anyone. To the extent the Court wishes to consider the Telegram-related evidence, his conduct came at an extraordinarily difficult time, after his girlfriend

apparently set him up to be murdered by her brother. With time, he has started to overcome the physical consequences of the attack, but the mental and emotional consequences led him to seek solace in drink and the social acceptance of unsavory characters on Telegram. A young man, Alex has surely learned much since his arrest, and he has shown himself to be resilient. A sentence of 18 months' imprisonment will send him a sufficiently clear message to steer clear of similar conduct, and to persevere again.

    DATED this 10th day of June 2025.

    Respectfully submitted,

    A. FITZGERALD HALL, ESQ.
    FEDERAL DEFENDER

    */s Samuel E. Landes*
    Samuel E. Landes, Esq.
    D.C. Bar No. 1552625
    Assistant Federal Defender
    400 North Tampa Street
    Suite 2700
    Tampa, Florida 33602
    Telephone:  (813) 228-2715
    Facsimile:  (813) 228-2562
    Email:  Samuel_Landes@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of August 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Lindsey Schmidt.

/s *Samuel E. Landes*
Samuel E. Landes
Assistant Federal Defender